UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WOLVERINE, PROCTOR & SCHWARTZ, LLC,**                 Chapter 7
    Debtor                                           Case No. 06-10815-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LYNNE F. RILEY, CHAPTER 7 TRUSTEE OF
WOLVERINE, PROCTOR & SCHWARTZ, LLC,**
    Plaintiff
v.                                                      Adv. P. No. 07-1179
**TENCARA, LLC**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MEMORANDUM

I. INTRODUCTION

The matter before the Court is the Motion of the Defendant, Tencara, LLC ("Tencara"), to Dismiss Count IV of the Chapter 7 Trustee's Second Amended Complaint, through which the Trustee seeks to equitably subordinate the claim of Tencara pursuant to 11 U.S.C. § 510(c) to the claims of other creditors. The Trustee objects to Tencara's Motion to Dismiss. The Court heard the Motion to Dismiss and the Trustee's Opposition

1

on October 14, 2009, and took the Motion to Dismiss under advisement.

## II. THE TRUSTEE'S SECOND AMENDED COMPLAINT

The Trustee's Second Amended Complaint (the "Complaint") contains four counts, is 18-pages long, and contains 71 separately numbered paragraphs, including 48 paragraphs containing factual allegations common to all four counts. In addition to Count IV, through her Complaint, the Trustee has sought to recharacterize Tencara's debt as equity (Count I), disallow its claim (Count II), and avoid its lien on the assets of Wolverine, Proctor & Schwartz, LLC (the "Debtor") (Count III).

In her Complaint, the Trustee focuses upon the relationship between David Callan ("Callan"), the sole member and manager of Tencara, as well as the sole member and manager of Continental Asset Management, entities which Callan allegedly used to make investments, and Deepak S. Kulkarni ("Kulkarni"), the Chairman of the Debtor and its sole common shareholder. According to the Trustee, Kulkarni became involved in a predecessor of the Debtor, Wolverine, Proctor and Schwartz, Inc. ("WPS Inc."), prior to 1990. From at least 1994 through 2001, he was the sole shareholder of WPS Inc., a company engaged in the manufacturing and sale of drying ovens for commercial users, which had a wholly owned subsidiary in the United Kingdom known as Wolverine Proctor & Schwartz Ltd. ("WPS UK").

In her Complaint, the Trustee alleged that in December 2001, WPS Inc. faced significant financial problems, including foreclosure proceedings which had been commenced by its principal secured lender, Citizens Bank. In response, Kulkarni entered

2

into an agreement with Parthenon Capital ("Parthenon") and its affiliates to recapitalize WPS Inc. The result of the recapitalization was the formation of Wolverine Proctor LLC to act as a holding company and the parent of the operating companies. As part of the transaction, Citizens forgave $10,000,000 in indebtedness owed by WPS Inc., and Parthenon advanced $14,000,000 to retire the remainder of Citizens Bank's debt and to provide working capital. Parthenon received preferred stock in Wolverine Proctor LLC, which owned 98% of the equity of Wolverine Proctor, Inc., which in turn owned 100% of the equity of WPS Inc. Though no longer the sole shareholder of WPS Inc. after the transaction, Kulkarni remained a consultant, minority shareholder and Chairman of WPS Inc. and its affiliates, earning approximately $1,000,000 per year. Additionally, he maintained ownership of Remedial Capital, LLC, a private equity firm investing in distressed companies and turnarounds.

According to the Trustee, on or before 2001, Callan and Kulkarni met socially and subsequently developed a "close personal friendship." In 2004, they also began working together on a daily basis at a company in which Callan had invested called Longlite LLC. Kulkarni continued his employment at Longlite in New York and also in Boston through April 1, 2006, the date of the filing of the Debtor's bankruptcy petition.

WPS Inc. and its affiliates had net losses in 2003 and 2004. During 2003, they were in violation of their covenants with their secured lender. In the early fall of 2004, Kulkarni sought to regain control of WPS Inc. and its affiliates and initiated discussions with Parthenon about a recapitalization and the purchase of its interests. Additionally, he

3

initiated discussions with Callan about investing in a new entity and participating in the recapitalization. In the fall of 2004, a Term Sheet was prepared which identified Callan's company, Continental Asset Management, as the source of a $3,000,000 investment to be used to "'effect a change of control transaction and provide [the Debtor] with working capital.'" Kulkarni also negotiated a letter of intent with Parthenon. Tencara was later substituted for Continental Asset Management in the documents.

According to the Trustee, after the execution of the letter of intent, Kulkarni and Parthenon sought the consent of GE Capital, WPS Inc.'s existing secured lender. Due to issues with GE Capital, Kulkarni approached CapitalSource ("CapSource") to replace GE Capital. Because of cash flow problems at WPS, Inc., Parthenon refused to permit WPS Inc. to pay CapSource a $75,000 commitment fee. That fee was ultimately obtained by Kulkarni from Callan. Although Callan advanced the commitment fee, he did not participate in the negotiations with Parthenon which continued through the winter of 2004-2005. CapSource required the execution of personal guarantees by Kulkarni and Callan, and Tencara reduced the amount of funds it would advance from $3,000,000 to $2,000,000. Parthenon, however, agreed to accept $2,000,000 in cash. The reduced advance, according to the Trustee, meant that there was no working capital provided by Tencara.

In contemplation of the change in control transaction, the Debtor was formed in December 2004 as a limited liability company with Kulkarni as it common shareholder.[1]

---

[1] The Court notes that owners of limited liability companies are generally referred to as members. Kulkarni signed the Certificate of Resolution authorizing the commencement of the Debtor's Chapter 7 case as "Member" and as "Manager,"

4

The Trustee represented, upon information and belief, that it had no assets and no capital. On February 11, 2005, the proposed transactions were finalized. The Debtor, Wolverine Proctor LLC, the holding company, Wolverine Proctor, Inc., the owner of the equity in WPS Inc., and WPS Inc. were parties to the transaction together with newly formed entities wholly owned by Kulkarni, namely Phoenix US, LLC and Phoenix UK, LLC. The Trustee alleged that as a result of the various agreements, the following transactions occurred:

> Phoenix US purchased all of the equity of Parthenon in Wolverine Proctor LLC in exchange for a $4.5 million note;
>
> Phoenix UK purchased the stock of WPS UK and an entity called Mawlaw 494, another UK company owned by Wolverine Proctor, Inc., for $100,000, the issuance of preferred stock in Phoenix UK and a warrant to purchase common stock in Phoenix UK.[2]
>
> The Debtor purchased the assets of WPS Inc., other than any claims against Parthenon, in exchange for a payment of $1.9 million, issuance of preferred stock in the Debtor, a warrant for the purchase of 10% of the common stock of the Debtor, the assumption of the liabilities of WPS Inc., other than the obligations under certain notes to Parthenon and the obligation for certain management fees payable to Parthenon;
>
> WPS Inc. distributed the consideration it received from both the stock sale to Phoenix UK and the asset sale to the Debtor to its ultimate parent, Wolverine Proctor LLC, together with any claims against Parthenon. Wolverine Proctor, Inc. also distributed the proceeds of the stock sale to its parent, Wolverine Proctor LLC.;
>
> Wolverine Proctor LLC transferred substantially all its assets to Phoenix US, other than certain claims against Kulkarni and his family members, including all of the cash, preferred stock, and warrants; and

---

although the petition itself was signed by Mark Brown as President.

[2] Tencara advanced the $100,000 to Phoenix UK for the purchase of stock in the UK entities.

>Phoenix US then transferred the entire consideration to Parthenon in satisfaction of the Phoenix note.

Tencara advanced $1,900,000 to the Debtor which it used to purchase the assets of WPS Inc. According to the Trustee, the Debtor issued a subordinated note to Tencara, secured by a security interest in all its assets, together with mortgages on real property associated with plants in Massachusetts and North Carolina. The Trustee added that "the Debtor granted Tencara a warrant, convertible into common shares of the Debtor."[3]

At the same time as the above transactions, the Debtor entered into a lending relationship with CapSource, the proceeds of which were used to pay WPS Inc.'s obligations to GE Capital. The Debtor granted a security interest in all assets as well as mortgages on the real property it owned to CapSource. At the closing of the transactions, the Debtor, according to the Trustee, recorded as equity $67,000 of the original $1,900,000.

Within two months of the closing, the Debtor faced cash flow problems, including problems with vendors, problems obtaining supplies, and problems completing customer jobs. Accordingly, it sought to refinance its mortgage debt through a sale and lease back arrangement in August 2005 with NL Ventures. The resulting transaction permitted payment in full of the CapSource mortgage debt and "an over advance on the working capital line," as well as the release of the guarantees executed by Kulkarni and the Callan. The NL Ventures transaction was intended to provide approximately $1,000,000 in excess of the sums due CapSource. Tencara, however, did not demand payment of those sums

---

[3] *See* note 1, *supra*.

in exchange for the release of its liens. Instead, according to the Trustee, it negotiated with Parthenon for equity in Phoenix UK in exchange for a release of its lien. That transaction was not consummated.

According to the Trustee, the transactions which were intended to provide the Debtor with additional working capital, failed to do so. Net proceeds were quickly depleted because the Debtor used the funds to pay, among other things, more than $700,000 in accounts payable, $142,000 in pension obligations and $180,000 to WPS UK for the benefit of Kulkarni. Thus, the sale and leaseback proceeds resulted in only a $360,000 increase in working capital for the Debtor.

In December of 2005, CapSource declared an event of default with respect to its security interests in the Debtor's personal property, which was subsequently cured. Nevertheless, a further default occurred in January of 2006, and CapSource declared a default in March and began collecting the proceeds of its collateral in a lockbox and applying them against the loan balance. The Debtor filed its petition on April 1, 2006.[4]

The Trustee represented that Tencara maintained few, if any, financial records,

---

[4] The Debtor listed only Tencara on Schedule D-Creditors Holding Secured Claims with a claim in the amount of $1,900,000. In the Trustee's Motion for Authority (I) to Operated the Business of the Debtor, (II) to Use Cash Collateral, and (III) to Borrow on a Secured and Priority Basis, she disclosed that "on or around March 7, 2006, the Debtor and CapitalSource entered into an agreement, confirming that upon receipt of a payment of $31,476.57, all sums due under the loan would be deemed paid, and any security interest terminated." The Debtor subsequently amended its Schedules adding an obligation to General Electric Capital Corp. in the sum of approximately $90,000 on Schedule D.

relying instead upon Kulkarni to provide reports with no set schedule or benchmarks. Additionally, according to the Trustee, Tencara took no steps to collect its debt and that Kulkarni referred to Tencara as an "investor" and the funds it advanced as "new capital." The Debtor, however, did make payments to Tencara in 2005 and 2006, including payments of $47,500 on June 30, 2005, September 30, 2005, January 9, 2006 and March 31, 2006.

Finally, the Trustee alleged that, after the petition date, Tencara offered to purchase the assets of the Debtor as a going concern, seeking to retain current management and requiring the Trustee to provide releases to its officers and directors, including Kulkarni. The Trustee stated that, although all relationships between Tencara and Kulkarni were required to be disclosed in the asset purchase agreement, Tencara failed to disclose that Kulkarni and Callan were both employees of Longlite LLC.

In addition to the allegations made in the Trustee's Complaint, the Court takes judicial notice of the Debtor's Schedules and Statement of Financial Affairs. In its Summary of Schedules filed on the petition date, the Debtor listed assets, comprised of personal property, with a value of $3,100,000 and unsecured debt of $4,654,601.24.

### III. DISMISSAL STANDARD

In Abbott v. Hanley (In re Hanley), No. 08-1381, 2009 WL 2827952 (Bankr. D. Mass. Sept. 1, 2009), this court discussed the standard for dismissal of complaints set forth in Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937 (2009). In that case, the Supreme Court amplified its discussion of the standard for dismissal contained in Bell Atlantic Corp. v. Twombly, 550 US. 544 (2007), which modified the long-standing test set forth in Conley v.

Gibson, 355 U.S. 41 (1957), for evaluating whether a complaint is sufficient to survive a motion to dismiss. The Supreme Court in Iqbal stated:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the defendant unlawfully harmed me accusation. Id., at 555, 127 S.Ct. 1955 (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127S.Ct 1955. Nor does a complaint suffice if it tenders "naked assertion [s]" devoid of "further factual enhancement." Id., at 557, 127 S.Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id., at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556, 127 S.Ct 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " Id., at 557, 127 S.Ct. 1955 (brackets omitted).
>
> Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id., at 555, 127 S.Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Id., at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court

9

> to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1949-50. *See also* O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group, Ltd.), 383 B.R. 231, 256 (Bankr. S.D.N.Y. 2008).

## IV. DISCUSSION

### A. Applicable Law under Section 510(c)

Section 510(c) provides in pertinent part:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may–
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The United States Court of Appeals for the First Circuit considered equitable subordination in In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332 (1st Cir. 1992), a case involving misconduct on the part of a bank for which the Federal Deposit Insurance Corporation was appointed receiver during the pendency of the appeal. The

First Circuit observed:

> [T]he generally recognized test for equitable subordination, adopted by this court, is set forth in In re Mobile Steel Co., 563 F.2d 692, 703 (5th Cir. 1977):
>
> > (I) The claimant must have engaged in some type of inequitable conduct.
> >
> > (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
> >
> > (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

In re 604 Columbus Ave. Realty Trust, 968 F.2d at 1353 (citing Mobile Steel at 699-700 (citations omitted). *See also* Boyajian v. DeFusco (In re Giorgio), 862 F.2d 933, 938-39 (1st Cir.1988) (applying the Mobile Steel test). The court also observed that the remedy of equitable subordination "is usually directed towards misconduct arising in three situations: when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds the other creditors. Id. at 1359-60 (citations omitted). Citing its decision in Giorgio, the court added:

> The case law does not suggest that the doctrine of equitable subordination gives the bankruptcy court a *general* license to weigh the moral quality of each debt or to compare creditors in terms of moral worth; rather it indicates that the bankruptcy court may equitably subordinate those debts, the creation of which was inequitable *vis-a-vis other creditors*. It permits a bankruptcy court to take account of misconduct of one creditor towards another, just as that court often can take account of a creditor's misconduct towards the *debtor* when considering whether to allow, or to disallow, a claim.
>
> Thus, most cases involving "equitable subordination" also involve corporate

>insiders or fiduciaries who have obtained unfair advantages over other creditors through, for example, fraud. Where a bankrupty court has subordinated the debt of a creditor who was not an insider, it has done so on the ground that that conduct was egregious and severely unfair in relation to other creditors.

968 F.2d at 1360 (citing Giorgio, 862 F.2d at 939)(citations omitted, emphasis in original). The First Circuit also noted that the level of scrutiny applied depends upon whether the creditor is an insider or a fiduciary of the debtor. Id. Thus, "[c]laims arising from dealings between a debtor and an insider are rigorously scrutinized by the courts," while "evidence of more egregious misconduct such as fraud, spoliation or overreaching is necessary" if the claimant is not an insider. Id. (citing Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1465 (5th Cir.1991)). Pursuant to section 101(31)(B) of the Bankruptcy Code, "[t]he term 'insider' includes . . . (B) if the debtor is a corporation-(I) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). "Additionally, in light of Congress's use of the term "includes" in § 101(31), courts have identified a category of creditors, sometimes called "non-statutory insiders," who fall within the definition but outside of any of the enumerated categories." Schubert v. Lucent Technologies Inc. (In re Winstar Communications, Inc.), 554 F.3d 382, 395 (3d Cir. 2009) (citing Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.), 531 F.3d 1272, 1276 (10th Cir. 2008)).

For the Trustee to survive Tencara's Motion to Dismiss, this Court must find that

there are well-pleaded factual allegations, which if true, plausibly give rise to entitlement to relief under section 510(c). The Court finds that the Trustee's Complaint contains well-pleaded factual allegations, which the Court must accept as true for the purposes of Tencara's Motion to Dismiss. The issue is whether those allegations support equitable subordination of Tencara's claim. Stated another way, can transactions with alleged characteristics of a leveraged buy-out ("LBO") give rise to a claim for equitable subordination, if the debtor is left with unreasonably small capital? The answer to that question is unquestionably yes when the LBO leaves a debtor with insufficient capital to sustain its operations. *See* Murphy v. Meritor Savs. Bank (In re O'Day Corp.), 126 B.R. 370 (Bankr. D. Mass. 1991).

According to the Trustee, Tencara, at Callan's behest, advanced the funds which enabled Kulkarni to reacquire control over the manufacturing business. The Debtor was created to purchase the assets of WPS Inc.; Parthenon conveyed its equity interests in Wolverine Products LLC., the indirect parent of WPS Inc., to Phoenix US, to whom WPS Inc. transferred the consideration it received from the Debtor for the sale of its assets. In exchange for advancing $1,900,000, Tencara obtained liens on virtually all assets of the Debtor and received quarterly payments right up to the day before the filing of the petition. As the Trustee has asserted, that conduct can plausibly be viewed as inequitable and injurious to other creditors, particularly if Callan is determined to be a non-statutory insider.

The Trustee has argued and pleaded plausible facts to support her contention that

13

Callan is an insider of the Debtor because of his very close personal and business relationship with Kulkarni. "Courts have held that creditors with no direct relationship with the debtor (other than as creditor) may be deemed non-statutory insiders by virtue of their close personal relationship with persons who are statutory insiders." *See* Hirsch v. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256, 263-64 (Bankr. S.D.N.Y. 2002).

Based upon Tencara's potential status as an insider, and based upon the Debtor's filing of a bankruptcy petition within 14 months of the change in control transaction, the Court finds that the Trustee has provided more than "[t]hreadbare recitals of the elements of a cause of action," and has made more than "mere conclusory statements" in support of her Complaint. *See* Ashcroft v. Iqbal, 129 S.Ct. at 1949. In short, she has pleaded sufficient facts to satisfy the Iqbal standard.

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order denying Tencara's Motion to Dismiss Count IV of the Trustee's Second Amended Complaint.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 18, 2009
cc: Michael L. Altman, Esq., Lynne Riley, Esq., Lee Harrington, Esq., Janet E. Bostwick, Esq.