## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WOLVERINE, PROCTOR & SCHWARTZ, LLC,**              Chapter 7
    Debtor                                      Case No. 06-10815-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LYNNE F. RILEY, CHAPTER 7 TRUSTEE OF
WOLVERINE, PROCTOR & SCHWARTZ, LLC,**
    Plaintiff
v.                                                  Adv. P. No. 07-1179
**TENCARA, LLC,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Second Amended Complaint filed by Lynne F.

Riley, the Chapter 7 Trustee (the "Trustee") of the Debtor, Wolverine, Proctor & Schwartz,

LLC (the "Debtor"), on July 16, 2009. Prior to the filing of her Second Amended Complaint,

the Court, on May 22, 2009, denied the Motion for Summary Judgment filed by the

Defendant, Tencara, LLC ("Tencara"), a Delaware limited liability company. Tencara

1

subsequently moved to dismiss Count IV of the Trustee's Second Amended Complaint (the "Complaint"), through which the Trustee sought to equitably subordinate its claim to the claims of other creditors pursuant to 11 U.S.C. § 510(c).  The Court heard the Motion to Dismiss and the Trustee's Opposition on October 14, 2009, and subsequently denied that motion.

The Court conducted a trial on May 24, 2010, May 25, 2010, May 26, 2010, May 27, 2010, June 2, 2010, June 7, 2010 and July 6, 2010 with respect to the four counts set forth in the Complaint, namely Count I - Recharacterization of Debt as Equity; Count II - Objection to Claim, Count III - Avoidance of Lien, and Count IV - Equitable Subordination of Debt Pursuant to 11 U.S.C. § 510(c).  At the trial seven witnesses testified and forty-three exhibits were admitted into evidence.  The issues presented include whether Tencara is an "insider" of the Debtor, whether its debt incurred on February 11, 2005 should be recharacterized as equity, and whether it engaged in conduct warranting the equitable subordination of its secured claim to the claims of all other creditors of the Debtor's bankruptcy estate.

The Court has jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (K), and 1334(b). The Court now makes its findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052

## II. FACTS

### A. The Debtor's Bankruptcy Case

The Debtor, a Delaware limited liability company, filed a voluntary Chapter 7 petition on April 1, 2006, together with its Schedules of Assets and Statement of Financial

Affairs.   On its Summary of Schedules, it initially disclosed total assets valued at

$3,100,889.00 and total liabilities of $6,554,601.24.   The Debtor amended its Schedules and

Statement of Financial Affairs on May 23, 2006, increasing both the value of its assets and

the amount of its debt to $3,921,390.50 and $6,645,092.74, respectively.[1] On both its original

and amended Schedule D-Creditors Holding Secured Claims, it listed Tencara as the holder

of a fully secured, non-contingent, liquidated and undisputed claim in the sum of

$1,900,000.00.

On July 31, 2006, Tencara timely filed a proof of claim, seeking:

> no less than the Petition Date Principal Amount, plus all accrued and owing
> fees, charges and interest permitted under the Secured Promissory Note and
> Security Agreement, including, without limitation, all of Tencara's attorneys
> [sic] fees and costs purusant to Section 4.3 of the Note and a Prepayment
> Premium equal to three percent (3%) of the outstanding principal balance in
> the event of prepayment of the Note pursuant to Section 2.4 of the Note.

In its proof of claim, it asserted that it was owed $1,896,476.67 as of the petition date.   The

Debtor was not in default with respect to Tencara's Secured Promissory Note and Security

Agreements as it had timely made all interest payments due and owing under the note.

The Court's Claims Register and the ultimate determination of allowed claims

reveals that the total amount of unsecured claims filed in the case equaled $40,892,852.10,

that the total amount of secured claims, including Tencara's claim, equaled $2,731,710.21,

and that the total amount of priority claims equaled $2,468,586.44.   Thus, the Debtor's

initial assessment of its outstanding prepetition obligations proved to be grossly inaccurate.

---

[1] The increase in indebtedness was attributable to an irrevocable stand-by letter
of credit held by General Electric Capital Corp.

For example, although the Debtor listed numerous individuals as the holders of contingent, unliquidated, and disputed "[p]otential employee benefits claims" in unknown amounts, the Debtor did not list the Pension Benefit Guaranty Corporation ("PBGC") as the holder of either priority or unsecured claims. On May 5, 2009, this Court granted the Trustee's Motion to Approve Settlement Agreement Regarding Pension Benefit Guaranty Corporation Claims pursuant to which the Trustee proposed the allowance of a priority, unpaid minimum contribution claim of $50,000.00, an unsecured, unfunded benefit liabilities claim of $8,399,500.00, as well as an unsecured plan premiums claim in the sum of $101,084.25. *See* In re Wolverine  Proctor & Schwarz, LLC, No. 06-10815, 2009 WL 1271953 (Bankr. D. Mass. May 5, 2009), *aff'd,* 436 B.R. 253 (D. Mass. 2010). The allowed claims of the PBGC alone exceeded the Debtor's statement of its total liabilities in its Amended Schedules by almost two million dollars.

The Debtor also did not provide an accurate assessment of its assets in its Schedules. Three weeks after the commencement of the Debtor's case, the Trustee filed a Motion (I) to Sell Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances, and (II) to Assume and Assign Leases and Contracts pursuant to which she proposed to sell substantially all of the Debtor's assets to Tencara for a purchase price consisting of (i) a payment of $150,000; (ii) a credit bid of Tencara's secured claim in the amount of $1,900,000; (iii) a credit bid of sums to be advanced under a proposed postpetition financing up to a maximum of $400,000; (iv) a credit bid of $50,000 for legal fees and other costs relating to Tencara's secured debt and due diligence costs in connection with the asset

4

purchase agreement, and (v) cure costs.   On April 25, 2006, the Court denied the motion.[2]

Subsequently, on May 31, 2006, the Trustee filed a Motion to Sell Substantially All of the Assets the Debtor Free and Clear of Any Liens, Claims, Interests and Encumbrances, through which she proposed to sell all the Debtor's assets to Aeroglide Corporation ("Aeroglide") or a successful bidder.  Following the filing of the Motion to Sell, the Trustee and Tencara entered into a Stipulation pursuant to which Tencara agreed that the Trustee could use up to $75,000 of Tencara's deposit paid in connection with its April 20, 2006 offer to purchase the Debtor's assets for expenses in exchange for a postpetition lien and security interest, payable from the proceeds of the proposed sale to Aeroglide.

On June 28, 2006, the Court conducted an auction of the Debtor's assets.  The successful bidder was CPM Holdings who submitted a bid in the sum of $8,200,000, plus additional consideration of $500,000 in connection with a settlement of a license dispute with the Debtor's affiliate in the United Kingdom.  Thus, the Trustee sold the Debtor's

---

[2] The Court stated:

For the reasons stated in the Objection of Ferguson Perforating & Wire Co. to the Trustee's Motion and by its counsel at the hearing, and certain arguments made by Peter A. Crawford in his objection to the proposed sale and at the hearing, in particular, that the overbid amount is excessive, that the assets being sold are not sufficiently identified, that the sale on the timetable proposed by the trustee and proposed bidding procedures may not be in the best interests of creditors and the estate in view of numerous questions concerning the connections of Tencara to the debtor and the debtor's relationship with WPS UK,  the court sustains the objections and denies the motion.

assets for approximately $6,000,000 more than the proposed sale to Tencara and $3,000,000

more than the value the Debtor ascribed to its assets in its Schedules of Assets.

In its Statement of Financial Affairs, the Debtor disclosed the following pertinent

information with respect to its ownership - - information which was also adduced at trial:

| NAME | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|------|-------|------------------------------------------|
| Deepak Kulkarni | Managing Member, Shareholder | 100% common |
| Mark Brown | President | 0 |
| Parthenon Investors II, LP | Preferred Shareholder | 100% preferred |
| PCIP Investors | Preferred Shareholder | 100% preferred |
| J&R Founders Fund, LP | Preferred Shareholder | 100% preferred |
| Tencara, LLC | Warrant Holder | Warrants for 10% |

Tencara held warrants for common units.  The Court notes that equity owners of limited

liability companies generally are referred to as members.  The members of limited liability

companies typically hold units as opposed to shares of stock.  The parties used the terms

units and stock interchangeably, and the Court will adopt the terms utilized by the parties.

Deepak Kulkarni ("Kulkarni") signed the Certificate of Resolution authorizing the

commencement of the Debtor's Chapter 7 case as "Member" and as "Manager," although

the petition itself was signed by Mark Brown ("Brown") as President.[3]  In addition to his

_____

[3] The Debtor disclosed in its Statement of Financial Affairs that Kulkarni was paid biweekly in the sum of $19,230.77 for a total of $538,461.56 in the year preceding the filing of the bankruptcy petition and that Brown was paid $8,653.84 biweekly during the same period, plus an additional $50,000, on September 22, 2005.

role as Managing Member and sole common stockholder of the Debtor, Kulkarni owned

Remedial Capital, LLC ("Remedial"), an entity which purchased distressed companies.

Phillip Constable ("Constable") worked with him at Remedial.  Both Kulkarni and

Constable were employed by Bain and Company prior to the events precipitating the

Trustee's Complaint.

As noted above, Tencara held warrants for 10% of the Debtor's common units at the

commencement of the case.  David Callan ("Callan") is the sole member and manager of

Tencara, as well as the sole member and manager of Continental Asset Management.

Callan testified that he uses both Tencara and Continental Asset Management as

investment vehicles.  He also testified that he personally funded Tencara and that he

owned a master bank account with sub-accounts for the various entities he controlled.

On May 1, 2007, the Trustee commenced the instant adversary proceeding against

Tencara, seeking to recharacterize its secured debt as equity or in the alternative to

equitably subordinate its claim to those of all other creditors.  To understand the rationale

for the Trustee's claims against Tencara, a brief financial history of the Debtor and its

predecessor in interest is required.  Additionally, the Trustee's claims are predicated, in

part, on the close personal and business relationship between Tencara's principal, Callan,

and the Debtor's former Managing Member, Kulkarni, who has been a key figure in the

business of the Debtor and its predecessor since 1990.

B. The Debtor's Predecessor and Its Business Operations Between 1998 and 2001

In March of 2004, Brown, Gibbons, Lang & Company, L.P. ("BGL"), an investment

7

banking firm, produced a "Confidential Executive Summary" for the Debtor's predecessor,

Wolverine Proctor & Schwarz, Inc. ("WPS, Inc."), "for use by prospective qualified

acquirers . . . in connection with their preliminary consideration of an acquisition of the

Company . . . ."    The report set forth a brief history of WPS, Inc., which BGL referred to

as the "Company" and described as "the established global leader in the production and

distribution of industrial hot air drying, cooking, curing and heat setting machinery." It

stated:

> For over 100 years, WPS [WPS, Inc.] and its predecessor companies have set
> the standard for quality dryers and ovens.  The Company serves major
> manufacturers, and in many instances is the sole supplier for a specific type
> of equipment, to General Mills/Pillsbury, Kraft Foods/Nabisco,
> Kellogg/Keebler, McCain Foods, Frito Lay, Nestle, Dow Chemical Company,
> Shell Oil Company and Cortaulds, among others.  Management estimates
> that the Company has an installed base of equipment in excess of $1.5 billion
> around the world, a penetration larger than all of its competitors combined.
>
> The Company's equipment is used primarily for drying, toasting, roasting,
> puffing, baking and other heat-treatment processes.  Although the Company
> has a long history of developing new applications for its technology, a large
> portion of its revenue has always been derived from the food industry,
> specifically the manufacture of cereals and snacks.  The Company operates
> two production facilities in the U.S. and one production facility in the U.K.
> to support its global sales effort; and it generates the bulk of its revenue from
> the sale of original equipment ("Large Orders") and a growing parts and
> service offering ("Small Orders").

As part of its overview of WPS, Inc., BGL noted that beginning in 1998 and continuing

through 2001 there was "a significant and prolonged downturn" in WPS, Inc.'s revenue

that adversely affected its profitability, resulting in "liquidity issues."  Indeed, its options

were severely circumscribed and included the commencement of a Chapter 11 case or the

8

appointment of a receiver, with a concomitant potential for liquidation. In short, WPS, Inc. was in dire need of a working capital infusion, and offers from potential buyers had failed to materialize after extensive due diligence.

In December of 2001, WPS, Inc. and Parthenon Investors II, LP, PCIP Investors, and J&R Founders Fund, LP (collectively, "Parthenon Capital"), completed a recapitalization of WPS, Inc. (the "2001 Transaction"), which followed a major corporate restructuring in 1999. At the time, WPS, Inc., which was then wholly owned by Kulkarni, who also served as Chairman of its Board of Directors, as noted above, was close to insolvency and burdened with significant debt. As part of the recapitalization, WPS, Inc. executed six promissory notes in favor of Parthenon Capital on December 28, 2001 and December 31, 2001, totaling $14,000,001.00. The notes, which were secured by all assets of WPS, Inc., had maturity dates of December 28, 2006 and December 31, 2006, but they also were payable earlier on demand. They provided for quarterly interest payments at the rate of 10% per annum, subject to reduction to no less than the "Applicable Federal Rate" at the discretion of the holder. Kulkarni signed the notes as did Mark Brown. Kulkarni's title was absent from the notes, while Brown executed the notes in his capacity as Chief Financial Officer.

Parthenon Capital's $14 million investment was used to retire debt and provide funds for working capital. WPS, Inc.'s former lender, Citizens Bank of Massachusetts, which was a party to a Loan and Security Agreement with WPS, Inc. dated February 24, 1999, agreed to accept $11,500,000 in satisfaction of its $21,500,000 secured debt, an obvious sign of WPS, Inc.'s financial weakness at the time. General Electric Capital Corporation

9

eventually became WPS, Inc.'s lender in September of 2002.[4]

As part of the 2001 Transaction, Parthenon Capital and Kulkarni executed a Limited Liability Company Agreement for Wolverine Proctor, LLC., a holding company that was formed in December of 2001. According to Exhibit 3.1 to the Agreement, Parthenon Capital contributed to Wolverine Proctor, LLC the notes executed by WPS, Inc. in its favor, and Kulkarni contributed 100,000 ordinary shares of MawLaw 492, Ltd., a British company that owned 51% of the stock of Wolverine Proctor & Schwartz, Ltd., which formerly was known as Friel Engineering, Ltd.,[5] and 1,357 shares of WPS, Inc., which owned 49% of the interests of Friel Engineering, Ltd. In exchange for their respective contributions, Kulkarni obtained 1,000 Class A units of Wolverine Proctor, LLC. and Parthenon Capital obtained a total of 1,000 Class B units in Wolverine Proctor, LLC.

Wolverine Proctor, LLC was managed by a five member Board of Managers. According to Exhibit 7.1 of the Limited Liability Company Agreement, the Board of Managers initially was comprised of Kulkarni, Brown and three representatives of

---

[4] According to the Notes to Consolidated Financial Statements for Years Ended December 31, 2002 and 2001, prepared by Vitale, Caturano & Company, P.C. dated February 21, 2003, "[t]he Company [WPS, Inc.]has a revolving line of credit facility with a bank [General Electric Capital Corporation] that provides domestic and foreign lines of credit of $4,500,000 and $4,000,000, respectively. Borrowings bear interest at the index rate plus 4.5% (5.80% at December 31, 2002). Under the lines of credit, the Company may borrow up to 85% of eligible accounts, as defined. The lines of credit expire on September 13, 2005. . . . The lines of credit are secured by substantially all of the Company's assets. . . ." WPS, Inc. also executed a term note in the principal amount of $1,750,000 with General Electric Capital Corporation.

[5] Prior to December 2001, Kulkarni was the sole owner of MawLaw 492, Ltd.

10

Parthenon Capital.

Wolverine Proctor, Inc., was a holding company formed as part of the 2001 Transaction. Wolverine Proctor, LLC owned all the stock of Wolverine Proctor, Inc., which, in turn, owned 100% of WPS, Inc. and 100% of MawLaw 492, Ltd. MawLaw 492, Ltd. owned 51% of Wolverine Proctor & Schwartz, Ltd., and WPS, Inc. owned the remaining 49% of Wolverine Proctor & Schwartz, Ltd. Wolverine Proctor, Inc. consolidated and reported the financial information of its subsidiaries. Tax returns it prepared for 2002, 2003 and 2004 were introduced into evidence.

Parthenon Capital, through its control of the Board of Managers of Wolverine Proctor, LLC, indirectly controlled WPS, Inc. Though no longer a shareholder of WPS, Inc. after the 2001 Transaction, Kulkarni remained a consultant and Chairman of WPS, Inc. According to BGL in its 2004 Confidential Executive Summary, he was "paid a consulting salary of $1.0 million and receives additional benefits of $100,000 annually." Pursuant to his Consulting Agreement with WPS, Inc., he specifically was entitled to a base salary of $500,000 per year, plus performance bonuses of $500,000 per fiscal year. Additionally, he received medical benefits for himself and his immediate family, as well as reimbursement of all reasonable and necessary business expenses.

C. The Business and Social Relationship of Kulkarni and Callan

Callan and Kulkarni met in the fall of 2003 and subsequently became friends and business colleagues. They began conversing regularly, discussing business, including the financial affairs of WPS, Inc. In 2004, they also began working together on a daily basis at

11

a company formed by Callan known as LongLite LLC ("LongLite"), which manufactured, marketed, and sold a device engineered to reduce the energy consumption of incandescent bulbs. Cullan, Kulkarni, and Constable regularly dined together and often traveled together to and from New York City where LongLite maintained office space at 400 Madison Avenue. Kulkarni focused on strategic objectives at LongLite, described by Callan as "go to market" options, while Constable, who had been the chief operating officer at WPS, Inc. for a period of time prior to 2001 and who met Callan through Kulkarni, focused on marketing and sales for the growing concern. Kulkarni worked at LongLite in New York and also in Boston through April 1, 2006, the date of the filing of the Debtor's bankruptcy petition.

Initially, neither Kulkarni nor Constable received any remuneration from LongLite except for travel and living expenses while in New York. Callan testified that in recognition of the contributions to LongLite made by Kulkarni and Constable, he and the other original shareholder, Jeff Drubner, granted Kulkarni an equity interest in the company of 10% and Constable an equity interest of 5%.

In addition to their business dealings, Kulkarni and Callan socialized and traveled together extensively, often joined by family members or significant others. They traveled to St. Tropez, France for seven to ten days, to Montreal, Canada, to Miami and South Beach, Florida, to Las Vegas, Nevada, and to Nantucket and Martha's Vineyard. They also entertained one another at their respective homes and occasionally provided one another with needed cash.

12

These social and business connections extended to Callan's use of Kulkarni's property to park his automobile when he worked in Boston. More significantly, Callan lent Kulkarni $75,000, one-half of the commitment fee required in connection with the so-called "2005 Transaction," which will be discussed below. The loan was not documented, no interest accrued, and Kulkarni did not repay Callan until one month before the commencement of the trial. Callan wired the funds directly to Kulkarni's account at Brown Brothers at Kulkarni's request and did not obtain any security for the loan.

While Callan assisted Kulkarni in making a sizeable personal loan, Kulkarni reciprocated by negotiating on Callan's behalf with Parthenon Capital with respect to obtaining an equity interest in Phoenix UK, LLC in August of 2005. That company was formed in December of 2004 in connection with the 2005 Transaction. Kulkarni obtained 100% of its common units, while Parthenon Capital obtained 750 preferred units. As part of the 2005 Transaction, Phoenix UK, LLC acquired all the equity interests of Mawlaw 492, Ltd. and all of WPS, Inc.'s ownership interest in Wolverine Proctor & Schwartz, Ltd. Callan, however, never obtained an equity interest in Phoenix UK, LLC because of adverse tax consequences.

The connectedness of Callan and Kulkarni's social and business dealings extended to their use of the same accounting firm, namely Vitale, Caturano & Co, P.C. and Wolverine Proctor, Inc. also engaged that firm to prepare consolidated balance sheets and tax returns.

13

D. <u>The Financial Circumstances of WPS, Inc. Preceding the 2005 Transaction</u>

The decision of Citizens Bank of Massachusetts to accept $11.5 million in satisfaction

of its $21.5 million loan and the infusion of working capital by Parthenon Capital allowed

WPS, Inc. "to pursue growth opportunities,"according to BGL, which also noted the

following:

> The recapitalization and strong order backlog propelled a rebound in
> operating performance in 2002 as sales increased for the first time in five
> years and profitability climbed.   More specifically, following the 2001
> recapitalization, total annual equipment orders increased 14.4% during fiscal
> 2002.   Additionally, the Company's aftermarket business experienced an
> increase of 13.9%.

That success did not last.  In 2003, WPS, Inc. again faced liquidity issues.  BGL identified

several "externalities that negatively impacted the business and its cash position, including:

1) the settlement of a lawsuit which resulted in extraordinary settlement and legal expense

costs of approximately $750,000; 2) underfunded pension liability which required WPS, Inc.

to fund approximately $800,000; 3) an increased shift in large orders to the U.K. operations,

which tended to be less profitable that the domestic operations; 4) WPS, Inc's inability to

generate any margin on web-related machinery despite an increase in revenue; and 5) the

loss of approximately $3.0 million in revenue from a competitor's allegedly unlawful entry

into one of WPS, Inc.'s key markets with "protected WPS technology," resulting in

litigation.

Despite the problems identified above, BGL noted recent bookings and steady order

volume growth since 2001, as well as a leaner cost structure which "should allow

profitability to increase sharply with revenue growth."  Additionally small orders grew

significantly with concomitant opportunity to generate revenues.  Based upon these

positive trends, BGL cited management's belief that future growth would be driven by

expanded business with existing customers, the penetration of new markets and

applications, expanding global production capacity and acquisitions of competitors.

Nevertheless, in March of 2004, the date of the Confidential Executive Summary, certain

payables had been stretched in excess of 90 days and "due to low discount rates and poor

plan performance, the gap between the actuarial value of the pension liability and the

current value of the plan assets has widened substantially, increasing from a funded status

of $1.1 million as of the end of fiscal 2000 to its current underfunded status of $5.0 million

as of the end of February 2004."[6]

WPS, Inc. retained BGL at the direction of Parthenon Capital for, in BGL's words,

"to raise new senior secured debt, mezzanine debt, and/or institutional private equity" for

the purposes of recapitalizing the Company and repaying existing senior indebtedness (i.e.,

General Electric Capital Corporation), funding working capital requirements, providing

an exit vehicle for all or part existing subordinated debt holders (i.e., Parthenon Capital),

and financing acquisitions.  According to David Ament ("Ament"), a partner at Parthenon

Capital, who was involved with a team of people managing Parthenon Capital's

"investment" in WPS, Inc., WPS, Inc. was "a stressed situation company that was

---

[6] BGL noted that, in response, effective February 1, 2004, WPS, Inc. canceled its post-retirement life insurance benefit for retirees.

constantly managing its cash flow, a company that was not performing well . . . [and] . . .

operating month to month from a cash flow standpoint."   WPS, Inc. engaged BGL to

consider "all options."  In sum, WPS, Inc. and its affiliates had net losses in 2003 and 2004.

During 2003, they were in violation of their covenants with their secured lender.

On July 30, 2004, Aeroglide, a competitor of WPS, Inc., through its president, J.

Frederick Kelly, Jr., submitted to BGL a letter setting forth "an agreement in principle

between Aeroglide and WPS, Inc. relating to "the acquisition of substantially all of the

assets owned directly or indirectly by the Company, through one or more direct or indirect

subsidiaries or affiliates of the Company . . . ."  Aeroglide's proposed acquisition was

subject to the filing of a bankruptcy petition "in order to provide the Purchaser with an

opportunity to acquire the business assets of the Company on a free and clear basis . . . ,"as

well as due diligence.  The purchase price was $18,500,000.  The letter was "Agreed and

Acknowledged" by the Chief Executive Officer of WPS, Inc.

WPS, Inc. and Aeroglide did not proceed with the transaction contemplated in

Aeroglide's July 30, 2004 letter.   Ament testified that Parthenon Capital "concluded the

most viable option for the business was to transact it back to Deepak Kulkarni who was the

chairman at the time."   He explained that the exhaustive process undertaken by BGL

"didn't flush out any interested parties that we [Parthenon Capital] felt were . . . viable."

He added that there were questions about the performance and strategic direction of the

business and "new capital sources were confused about who was running the business,

what Deepak Kulkarni's role was, and - - and ultimately . . . [there were] . . . questions

16

about his compensation."

In an email to Kulkarni from his counsel, which he forwarded to Callan, Charles Dougherty, Esq. ("Dougherty") stated that he had learned that Parthenon Capital "may just punt, which means go forward with Aero [Aeroglide] for lack of interest in working on this any more than necessary" and that Parthenon Capital was "tired of dealing" with Kulkarni. Nevertheless, Dougherty suggested that Parthenon Capital was aware of the risk associated with closing a deal with Aeroglide "without accomodation [sic] for unsecureds."  Ament testified that Parthenon Capital had concerns about a bankruptcy sale because WPS, Inc. was Aeroglide's largest competitor and the filing of a bankruptcy petition was "a very unpredictable path and . . . very damaging to the business had we not completed it."

In late 2004, WPS, Inc. had serious cash flow problems.  It was unable to meet its current obligations and approximately $730,000 of its payables were more than 90 days over due.  In an email to Brown, dated October 19, 2004, Bill Crotty, an executive with WPS, Inc., indicated that vendors were unhappy, that sales representatives had not been paid and were "ticked off" and that the company was not in a conservative mode but in a survival mode.

On September 28, 2004,[7] Kulkarni, as Managing Member of Remedial, submitted a Letter of Intent to Ament "with respect to the Wolverine Proctor group of companies. Remedial's letter followed a term sheet prepared by Callan's company, Continental Asset Management, LLC, dated August 23, 2004 and amended on October 12, 2004, for a

---

[7] Kulkarni may have submitted earlier versions of his Letter of Intent to WPS, Inc.

17

subordinated loan in the amount of $3 million, bearing interest at the rate of 18%, payable

quarterly in arrears with a $90,000 fee payable at commitment or closing, conditioned upon

management by Remedial Capital or its designee with a base fee not to exceed $500,000.

In its letter, Remedial proposed the following transaction:

> [F]ollowing the completion of all steps in the proposed transaction, described
> more specifically in the section titled "Structure" below, two separate entities
> or partnerships would survive.  One such entity ("US Newco"), would hold
> the US assets and liabilities of Wolverine Proctor & Schwartz, Inc. ("WP&S")
> actual and contingent, including the existing pension obligations of the
> business but excluding the accrued PCAP management fee and excluding the
> $14 million loan made by Wolverine Proctor  LLC ("LLC") in WP&S.  The
> other, ("UK Newco"), would own all the UK assets and liabilities, actual and
> contingent of Wolverine Proctor & Schwartz, Ltd. ("Ltd.") LLC, Wolverine
> Proctor Inc. ("Holdings), and WP&S would be liquidated as part of these
> transactions.

Remedial's proposed transaction was predicated upon the assumption that $500,000 would

be made available at closing by Capital Asset Management, LLC for working capital.

Moreover, Kulkarni stated on behalf of Remedial: "CAM [Capital Asset Management, LLC]

shall commit, or Remedial Capital shall arrange, working capital, as needed, of up to an

additional $1.5 million to provide liquidity to the company during any restructuring

efforts."

Additionally, as part of the transaction proposed by Remedial, the $14 million

obligation to Parthenon Capital, which Parthenon Capital had contributed to Wolverine

Proctor, LLC, would not be excluded.  Indeed, Kulkarni, worried about a potential

bankruptcy sale to Aeroglide at the behest of Parthenon Capital, particularly when coupled

with the provision of the Limited Liability Company Agreement authorizing full payment

18

of Parthenon Capital's notes in the sum of $14 million in the event of a "Liquidation

Event."  Kulkarni believed that the $14 million indebtedness should be characterized as

equity.  His attorneys at Epstein Becker & Green, P.C. drafted a three count complaint

against Parthenon Capital and others seeking a determination that Parthenon Capital's $14

million investment was not a loan and should be recharacterized as an equity infusion.

Notably, Keith D. Lowey ("Lowey"), the Trustee's expert witness, concurred, concluding

that there was  no evidence that Wolverine Proctor, LLC, to whom the Parthenon Capital

notes were assigned, ever received interest on the notes.  Additionally, in support of the

recharacterization of Parthenon Capital's debt, the Operating Agreement for Wolverine

Proctor, LLC required Parthenon Capital to hold a controlling position on the board of

directors of Wolverine Proctor, Inc., Parthenon Capital was entitled to a yearly

management fee of $500,000, and its overall role in the market was that of "a private equity

firm."

       During the course of negotiations between Parthenon Capital and Kulkarni in the

fall of 2004, both parties assumed that General Electric Capital Corporation would remain

in place as senior lender.  It, however, advised the parties that it required a cross-guarantee

from Wolverine Proctor & Schwartz, Ltd., a condition that the British company's lender

would not permit.  Accordingly, Kulkarni began searching for another lender and

ultimately obtained a commitment from CapitalSource Finance, LLC ("CapSource").

       CapSource required a $150,000 commitment fee.  Parthenon Capital refused to

permit WPS, Inc. to pay the fee, and, as set forth above, Callan personally lent Kulkarni

one-half of the fee.  Additionally, Tencara, not Capital Asset Management, LLC, lent the

Debtor, a newly created entity to effectuate Kulkarni's re-acquisition of the business of

WPS, Inc.,  $1,900,000, as will be discussed below.

E. The 2005 Transaction

On February 11, 2005, Wolverine Proctor, LLC, Wolverine Proctor, Inc., and WPS,

Inc., together with newly formed entities, Phoenix US, LLC, Phoenix UK, LLC, and the

Debtor, as well as Kulkarni and Parthenon Capital, executed an Omnibus Agreement and

numerous additional documents to effectuate Kulkarni's re-acquisition of WPS, Inc.  That

agreement expressly stated Parthenon Capital's "desire to sell and dispose of all of its

interests" in Wolverine Proctor, LLC to Phoenix US, LLC in exchange for three unsecured

demand notes in the aggregate principal amount of $4.5 million (collectively, the "Phoenix

Note").  The agreement also referenced the desire of the other parties to the transaction "to

enter into a series of transactions to restructure the equity and debt" of WPS, Inc.,

Wolverine Proctor, Inc. and Wolverine Proctor, LLC "with a view toward obtaining

additional working capital financing for the U.S. operations" and "facilitating further

financing in the future for both the U.S. and U.K. operations" owned by Wolverine Proctor,

LLC.  In furtherance of these goals, Tencara loaned the Debtor the sum of $1.9 million and

loaned Phoenix UK, LLC the sum of $100,000.

The parties to the Omnibus Agreement contemplated execution of an Asset

Purchase Agreement pursuant to which the Debtor agreed to purchase WPS, Inc.'s

operating assets,[8] excluding "all claims of any kind or nature that the Seller [WPS, Inc.] has

or may have of any kind or nature, whether known or unknown, absolute or contingent,

against any of the Parthenon Entities or any of their affiliates . . . ."  The Debtor also

assumed certain liabilities and agreed to perform, pay and discharge, and indemnify WPS,

Inc. from all the liabilities, except those excluded.  The excluded liabilities and obligations

were those arising out of the Parthenon Capital notes dated December 28, 2001 and

December 31, 2001.

The Omnibus Agreement provided for the satisfaction of the Phoenix Note to

Parthenon Capital through the transfer or distribution of $2.0 million in cash, as well as

other consideration, including issuance of 750 preferred units of the Debtor, 750 preferred

units of Phoenix UK, LLC, and warrants for 28 and 31 of the common units of Phoenix UK,

LLC and the Debtor, respectively.  Ament testified that he recalled that the warrants

constituted 10% of the common units of each entity.  The sums paid to Parthenon Capital

pursuant to the Omnibus Agreement and the other closing documents did not include

interest.

As part of the restructuring, Wolverine Proctor, LLC, Wolverine Proctor, Inc. and

the Debtor's predecessor, WPS, Inc., were dissolved and the Debtor, Phoenix US, LLC and

---

[8] The operating assets included all notes and notes receivable, all prepaid expenses, refunds, rights of offset and other current assets, contract rights, leases, licenses, all books and records, all fixed assets, including furniture, fixtures,  and computer systems and related software, all intangible property, including but not limited to inventions, discoveries, licensing arrangements, trade secrets, and patents, described as "know-how," and all other assets, property claims, rights and interests, tangible or intangible, real, personal or mixed.

Phoenix UK, LLC were created.  Kulkarni was the managing member of Phoenix UK, LLC,

holding 250 common units.   Phoenix UK, LLC borrowed $100,000 from Tencara to

purchase from Wolverine Proctor, Inc. all of its equity interest in Mawlaw 492, Ltd. and

from WPS, Inc. all of its equity interest in Wolverine Proctor & Schwartz, Ltd.

Additionally, pursuant to the Omnibus Agreement, Kulkarni was paid $270,480

attributable to deferred compensation under his Consulting Agreement with WPS, Inc.,[9]

plus Remedial was paid $112,500.

According to Lowey, the 2005 Transaction "did not serve to eliminate $14 million

in debt," as that "debt" was, in fact, equity.  Rather, it "saddled the Debtor with over $2

million in transaction and reorganization-related expenses, with no increase in working

capital." He concluded that after the 2005 Transaction, the Debtor's financial condition on

a net equity basis was worse than its predecessor's because of an increase in long-term

liabilities.

The 2005 Transaction was financed by CapSource and Tencara.  As noted above,

---

[9] In an email to Brown on November 1, 2004, in anticipation of the 2005
Transaction, Kulkarni stated:

> I made some changes to the capital tab.  I added data to back the deal fees
> and the change from the 2004 to 2005 g & a.  I increased restructuring to
> $620 and changed the line properly.  You may wish to QC.  *To hide the*
> $270,480 *being created form me*, lets make a direct change to the equity line
> and increase accruals by a like amount.  Then we should have the version
> that we send cap source not have the cash flows or the equity
> reconciliation.  *That way it all stays stealth*.  We should include deal fees as
> shown and the comp reconciliation as shown . . . .

(emphasis supplied).

Tencara loaned the Debtor $1.9 million secured by all the purchased assets, both real and personal and obtained a warrant to purchase 31 common units of the Debtor. The Secured Promissory Note was executed by Brown, and contained a maturity date of February 11, 2009. It provided for interest at the rate of ten percent per annum on the unpaid principal amount, computed on the basis of a 360-day year of twelve 30-day months. In the event of a default, the Note provided for a default rate of interest of twelve percent. Interest was payable under the Note on the last business day of March, June, September and December. The Security Agreement was executed by Brown as President, and the 23-page Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, which was duly recorded, were executed by Kulkarni as Manager. Pursuant to the terms of the Mortgage, the Debtor granted, conveyed, mortgaged and assigned, with mortgage covenants and with power of sale and right of entry and possession, all of its right, title and interest, now owned or hereafter acquired in and to real property, as well as all improvements, rights, licenses, easements and the like, leases and occupancy agreements, goods, equipment, machinery, furnishings, furniture, chattels and articles of personal property of every kind and nature whatsoever, "now or hereafter located on the Real Property or used or to be used in connection with the construction, operations, maintenance, occupancy or use of the Improvements . . . , and all proceeds of the sale or conversion, voluntary or involuntary, of all or any portion of the property . . . ." Pursuant to the Security Agreement, the Debtor granted Tencara a security interest in its personal property, including, among other things, accounts, commercial tort claims, chattel paper, deposit accounts, documents, equipment,

23

general intangibles, goods, instruments, intellectual property and inventory. The Trustee

did not challenge the perfection of Tencara's liens.

Tencara subordinated its security interest and mortgages to those obtained by

CapSource, which, together with the Debtor, executed a 53-page Revolving Credit, Term

Loan and Security Agreement (excluding schedules and appendices) on February 11, 2005.

Callan, on behalf of Tencara, negotiated with CapSource with respect to its Subordination

Agreement, which provided in pertinent part the following:

> Lender [CapSource] is willing to execute, deliver and perform under the
> Loan Agreement and other Loan Documents and to make the Revolving
> Facility and Term Loan available only upon the condition that each of
> Borrower and Subordinated Lender executes and delivers to Lender this
> Agreement and agrees to perform and to comply with the obligation under
> this Agreement.

The loan documents provided that CapSource would make available to the Debtor

revolving credit  facilities in a maximum principal amount at any time outstanding of up

to $3.5 million, and a term loan in a maximum principal amount of $2.75 million, the

proceeds of which were to be used by the Debtor for refinancing its existing obligations

and indebtedness to General Electric Capital Corporation and working capital needs.  The

Revolving Facilities consisted of a Revolving A Facility and a Revolving B Facility.  The

former included a "Domestic Subfacility" and an "Exim Subfacility."[10]

---

[10] According to Lowey,

> EX-IM Financing is an accredited U.S. bank program under which U.S.
> manufacturers who meet certain Robert Morris Associates ratio criteria
> can borrow against up to 90% of their foreign receivables and against up
> to 75% of their inventory, including work in process.  Under an EX-IM

Gabor Garai, Esq. and Foley & Lardner LLP represented the Debtor in connection

with the loans from CapSource. The law firm was paid $322,982.88 for its work on behalf

of the Debtor.  Lawyers Title Insurance Corporation set forth that disbursement, as well as

the following other disbursements to account for receipts of $3,594,676.37 and $2,000,000

from CapSource and Tencara, respectively:

| | |
|---|---:|
| LandAmerica Financial Group - -NCS | $475.00 |
| Wolverine, Proctor & Schwartz, LLC, a Delaware limited liability company | tbd |
| Lawyers Title Insurance Corporation  - Winston-Salem, NC | |
|     Recording fees, premium | $9,520.00 |
| Lawyers Title Insurance Corporation  - Boston, MA | |
|     Recording fees, premium | $11,500.00 |
| Nixon Peabody LLP | |
|     Legal Fees - Tencara Counsel | $23,000.00 |
| GE | |
|     Loan Payoff - MA and NC | $3,214,630.99 |
| Parthenon Investors II, LP | |
|     Payoff | $1,952,988.58 |
| PCIP Investors | |
|     Payoff | $16,561.28 |
| J & R Founders Fund, LP | |
|     Payoff | $30,450.14 |
| Foley Lardner LLP | |
|     Legal Fees - Capital Source counsel[11] | $322,982.88 |
| Carruthers & Roth, P.A. Trust account | |
|     Legal Fees | $1,750.00 |
| Bigham McCutchen[12] | |
|     Legal Fees | $10,817.50 |
| | |
| TOTAL DISBURSEMENTS | $5,594,673.37 |

As a result of the 2005 Transaction, the Debtor began operations with liabilities of

---

facility, exported products must contain more than 50% of U.S. materials,
inventory must be domiciled in the U.S. and inventory must be backed by
confirmed export purchase orders.

[11] As noted, Foley Lardner LLP was counsel to the Debtor.

[12] Bigham McCuchen LLP was special counsel to CapSource.

approximately $5.6 million in secured debt to CapSource and Tencara.  Additionally, it

assumed WPS, Inc.'s sizeable trade debt [13] and the substantial sums owed for underfunded

pension liabilities.

Kulkarni and Parthenon Investors II, L.P. were required to provide guarantees of

full payment to CapSource.  To secure his guaranty, Kulkarni pledged his Membership

Interest in the Debtor, as well as the following:

> [A]ll amounts, additional membership or other equity interests in Borrower
> [the Debtor], any successor in interest to Borrower and any Subsidiary of
> Borrower and other equity interests to which Pledgor or any successor in
> interest to Pledgor (with or without additional consideration) is or becomes
> entitled by virtue of the ownership by such person of any of the Membership
> Interests or as the result of any reorganization, merger, consolidation,
> distribution, conversion, preemptive right or otherwise, and the proceeds
> thereof , including . . . Pledgor's right, title and interest in and to the profits
> and losses of Borrower or any successor in interest to Borrower, and . . . all
> voting and governance rights, privileges, authority and powers of Pledgor
> as owner or holder of Membership Interests.

E. Tencara's Due Diligence

As principal of Tencara, Callan, who testified that he was an entrepreneur with high

technology experience having founded six or seven companies, was responsible for its due

diligence in contemplation of the loan to the Debtor.   Originally, Capital Asset

Management, LLC proposed a $3 million loan.  Callan did not review any financial

---

[13] The evidence was inclusive as to the amount of trade debt assumed.  Certain
exhibits indicated the Debtor assumed debt of $2,118,000 [Exs. 27, 41], while the 2004 tax
return filed by Wolverine Proctor, Inc. set forth accounts payable of $1,673.069 for the
tax year ended December 31, 2004.  That accords more closely with the Balance Sheet for
Wolverine Proctor & Schwartz US, prepared by Kulkarni for Tencara which showed
accounts payable of $1,737,000 for 2004 [Ex. 34].

information before preparing the term sheet for that loan, although he testified that the loan

was obviously subject to due diligence.

With respect to the Tencara loan, Callan gleaned most of his information about WPS,

Inc. and its financial prospects from conversations with Kulkarni and Constable, although

Constable had not been involved with the operations of WPS, Inc. for a number of years.

Additionally, he reviewed certain financial information pertinent to WPS, Inc.'s operations

with Kulkarni on Kulkarni's computer.   Callan testified as follows with respect to his due

diligence on behalf of Tencara:

> I guess you could say that the due diligence started in conversations with
> Deepak and Phillip - - Phillip Constable, regarding issues that the company
> had, strategy for the company, and it could even be, you know, simple day-
> to-day type operational questions that Kulkarni might be soliciting to get
> some advice on – to, you know, more formal due diligence in the form of
> reviewing paper copies, as well as extensive electronic copies of financial
> information, both historical and current for the company.

> Visited the company, the real estate in Merrimac, New Hampshire [sic].  Did
> extensive modeling on the small parts business that you know, seemed to be
> the most valuable piece of collateral other than the real estate of the
> company. . . .

> [J]ust a quick brush, that was a five to six million dollar business historically,
> could have been as high as ten million in any given year.  It was a [sic]
> approximately 50 per cent gross margin business.  It was really the cash cow
> as far as the operations of Wolverine went in the United States.  I assigned a
> value in due diligence of north of 20 million dollars from that, for that small
> business, small parts entity.

> It was, it had one employee and the bulk of its - - the bulk of its costs were
> simply, you know, raw materials.  The engineering had already been done.
> These replacement parts for a huge population of existing commercial dryers,
> you know, for cereal and tobacco.

Callan also testified that he did not visit WPS, Inc.'s other facilities in North Carolina and Pennsylvania, on behalf of Tencara and that Tencara did not require a personal guaranty from Kulkarni.  He also admitted that he was unaware of Kulkarni's compensation prior to the 2005 Transaction and had no concern about it in the context of Tencara's loan to the Debtor.

Tencara relied upon a document captioned "Wolverine Proctor & Schwartz 2004 Performance Summary," which contained a profit and loss summary for 2004 and a "Commentary," as well as a Balance Sheet, Income Statement and Cash Flow Statement for "Wolverine Proctor & Schwartz US" for the years 2001, 2002, 2003, and 2004.[14]   The Commentary to the 2004 Performance Summary, which was given to Callan by Kulkarni, indicated that "[t]he year 2004 is characterized by a solid turnaround performance in our US operation offset by a hugely disappointing and frustrating result in our UK operation." The Commentary also contained the statement that there was a 58% increase in EBITDA resulting from strong equipment booking activity and a savings from cost restructuring, as well as " a healthy backlog entering 2005. . . ."  Under the caption, "Major Activities in 2004," the Commentary contained references to 1) the February 2004 termination of "the US Post-Retirement Medical Program, . . .[which] . . . resulted in a $3.3 million reduction in long-term liabilities and improved annual cash flow by $350-$400k per year;" and 2)

---

[14]  The Balance Sheet did not reflect the $14 million owed to Parthenon Capital, either as a current liability or as long term debt.  The Income Statement reflected interest expenses and Parthenon Management Fees, but it is impossible to ascertain whether the interest payments related to the $14 million inter-company debt.  The management fees were listed as "(500)" for 2002, 2003, and 2004.

"[s]trong order performance in the US . . . [which] . . . has enabled the company to struggle through 2004 and remain viable during the protracted transaction process."

Callan also testified that he was aware of Kulkarni's plans for the future operations of WPS, Inc.'s successor, namely the outsourcing of manufacturing and engineering to India. Callan explained that fifty percent of the cost of equipment was in raw materials, primarily steel, while the balance, with the exception of sales, general and administrative type costs, was in manufacturing and engineering. He stated the goal was to reduce the latter costs by half.

With respect to specific disbursements, Callan admitted that he did not ask Kulkarni about the extent of restructuring costs associated with the 2005 Transaction and that he was unaware that Kulkarni was to be paid $270,480 with respect to deferred compensation under his Consulting Agreement with WPS, Inc. and that Remedial, Kulkarni's company, was to be paid $112,500 in connection with fees previously paid to CapSource on behalf of the Debtor. Additionally, Callan admitted that he did not read the closing binder for the 2005 Transaction and was unaware of the kinds of liabilities the Debtor was assuming, including liabilities to the PBGC. He testified, however, that he relied on the value of the assets and, based on his review, believed that the loan was fully secured by the collateral's value. He further testified that the collateral value was the main reason Tencara made the loan.

F. Events Subsequent to the 2005 Transaction

As noted above, the Debtor began its operations with approximately $5.6 million in

secured debt owed to CapSource and Tencara.   Additionally, it assumed WPS, Inc.'s substantial trade debt,[15] as well as its substantial underfunded pension liability - the amount of which neither Kulkarni nor Callan appeared to fully comprehend at the time of the 2005 Transaction.

Following the 2005 Transaction, the Debtor generated working capital through its Revolving Credit loan with CapSource and also, as Callan recognized, through customer deposits.   Customers were required to supply the Debtor with a thirty to forty percent deposit at the time they placed their orders, and the Debtor was not required to pay interest to customers for the use of their funds.   Nevertheless, after the 2005 Transaction, according to Kulkarni, the Debtor  "was operating with some cash constraints."   Brown was more emphatic, stating that the Debtor was "struggling."   Brown admitted that he had advised Kulkarni that the company could "barely afford utilities, never mind suppliers" and that the shortage of cash was affecting the Debtor's ability to make deliveries.   Thus, within two months of the closing, the Debtor confronted cash flow problems, which adversely affected its ability to obtain supplies and complete orders.

Exacerbating the cash flow problems, Kulkarni, in his testimony, complained that

---

[15] The 2004 tax return filed by Wolverine Proctor, Inc. set forth accounts payable of $1,673.069 for the tax year ended December 31, 2004.  This approximately accords with the Balance Sheet supplied to Tencara by Kulkarni which set forth accounts payable of $1,737,000. The opening balance sheet for the Debtor dated February 11, 2005 set forth accounts payable of $2.118 million.  *See* note 13, *supra*.

CapSource failed to quickly provide the Debtor with EX-IM financing[16] which adversely affected its production schedule.  Indeed, Kulkarni described CapSource as "somewhat slippery and unethical" even before the 2005 Transaction closed, adding that he did not have a good personal relationship with the head of the unit at CapSource overseeing the Debtor's Revolving Credit and Term loans.   Kulkarni also complained that CapSource's operational team, which replaced its "deal team," added to the Debtor's problems so that, in Kulkarni's words, when the Debtor "missed . . . the covenants and so forth in September [of 2005], even though they were cured, they weren't inclined to work with us."   In short, CapSource, according to Kulkarni, squeezed the Debtor's ability to access credit.

At this time, however, Callan, on behalf of Tencara, was not actively monitoring the Debtor's cash flow.  Although he made inquiries about the status of the Debtor's business intermittently, he was unaware of the extent and scope of the problems until they reached critical proportions.  Callan testified that he reviewed financials only three or four times throughout 2005.  Indeed, he did not discuss the Debtor's operations with Kulkarni between February and June of 2005.

Because of its problems with CapSource and its deteriorating cash flow position, the Debtor almost immediately after the February 11, 2005 Transaction began seeking to refinance its secured debt through a new lender.  Kulkarni admitted that he was motivated in part by a desire to eliminate his personal guaranty of the Debtor's obligations to

---

[16]According to Lowey "[a]lthough the CapSource loan agreement provided for EX-IM financing, CapSource did not have EX-IM accreditation at the time of the Transaction and did not obtain accreditation until circa September 2005."

CapSource. Although TD Bank North and Chittenden Bank expressed interest in becoming the Debtor's secured lender, and TD Bank North engaged in extensive due diligence, negotiations faltered because Kulkarni refused to provide a personal guaranty.

Because of its inability to find a substitute lender for CapSource, in part due to Kulkarni's refusal to personally guaranty a loan, the Debtor entered into a sale and lease back arrangement in August 2005 with NL Ventures (the "Sales Leaseback Transaction").[17] Kulkarni testified that Brown was the lead negotiator with NL Ventures. As part of that transaction, the Debtor sold its real estate and plants in Merrimac, Massachusetts and Lexington, North Carolina in exchange for consideration of a cash payment of $4.75 million and the execution of leases for the plants. Immediately after the transaction, Kulkarni caused the Debtor to transfer $180,000 to the UK company and to pay Brown a $50,000 bonus for handling the negotiations with NL Ventures.

The Settlement Statement, dated August 15, 2005, from the Sales Leaseback Transaction revealed that the Debtor disbursed $4,749,950 after the closing, and, specifically, that CapSource was paid $4,121,662.90 from the sale proceeds. In contrast, in a document captioned "Proceeds from Sale of Building [sic]," which Kulkarni forwarded to Brown and others in an email dated October 26, 2005, Kulkarni reported that the Debtor's cash position improved as a result of the Sales Leaseback Transaction as follows:

| Sources | AIC | $4,750,000 |
| | Less security deposit | (500,000) |

---

[17] In documents filed with the Court in the Debtor's main case, NL Ventures identified itself as NL Ventures V Wolverine, LP.

|  |  | | |
|---|---|---|---|
| | Less fees etc [sic] | | (93,238) |
| | Net | | 4,121,762 |
| Uses | Cap Source Term loan | | (2,160,000) |
| | Cap Source overadvance | | (392,857) |
| | Net | | (2,552,857) |
| Net from Sales Transaction | | | 1,568,905 |
| Post Closing Uses | | | |
| Paydown of AP and other | | | 702,746 |
| Taxes on restructuring | | | 100,000 |
| CapSource Early termination fee | | | 50,000 |
| Pension | | | 142,000 |
| Change in working capital | | | 177,000 |
| Misc | | | 38,150 |
| | Net | | $1,209,905 |
| **Increase in Cash** | | | 359,000 |

The discrepancy between the Settlement Statement and improvement in working capital noted by Kulkarni is explained by the amount of payments made to CapSource. The Settlement Statement reflected payment of $4,121,662.90, a sum which would have included payment of the term loan of $2,750,000 and a portion of the Revolving Credit facility, while the internal document reflected payments of $2,602,857.[18]   In other words, CapSource's term loan appears to have been satisfied, while the working capital line of credit remained in place.

---

[18] At the end of the email, Kulkarni was identified as Chief Executive of LongLite, LLC.

In connection with the Sales Leaseback Transaction, Tencara released its liens for no

consideration.  Callan explained Tencara's rationale as follows:

> Tencara was comfortable then, as it was in February, that the collateral
> value of the company exceeded the debt exposure of the company in both of
> those instances.

> It made further sense for this company, from a working capital
> perspective - - this company has been challenged, . . . my due diligence
> certainly illuminated it, that there had been working capital challenges for
> the company historically. . . . Every balance sheet I've seen, both historical
> and current during the '05 period indicated a current ratio of approximately
> .5.  Things weren't any different in August of 2005.

> What the sale leaseback net effect was is very easy.  That the company
> received an improvement in working capital directly through the reduction
> in interest payments that were traded for lease payments of approximately
> 230 [sic] or $250,000.

> ***

> The improvement to the balance sheet though, and I think this is very
> important, this is all about a balance sheet.  The improvement of the, or what
> the balance sheet distorted, okay, or didn't accurately reflect was the value
> of the company's equity, okay?  There was a two million dollar plus or minus
> betterment or realization or unlocking of company equity value by virtue of
> the sale and leaseback.

Despite the sizeable payments made to CapSource, "nearly a million in fees" and

"nearly a million in interest" according to Callan, CapSource declared a default in early

2006 and froze the Debtor's account.[19]  Specifically, CapSource, without warning and at a

time when the line of credit was in the $200,000 range, swept the Debtor's lockbox and paid

---

[19] Callan noted that Tencara took $225,000 in interest and $23,000 in fees, which
were "largely a result of Draconian unreasonable negotiating of that subordination
agreement with CapSource."

itself off, precluding the company from making payroll.  According to Brown, CapSource was "just trying to get out whole out of the company [sic]."  Kulkarni concurred.  He testified:

> I think the main reason why the company had filed for Chapter 7 was that between the period September through March, CapSource put in various blocks on the working capital line and slowly started squeezing our ability to draw on the line.  And the effect of that was to make the line smaller and smaller and give us access to less and less credit.

> And ultimately CapSource cut the line down to a point where they could pay themselves off completely in full and take a prepayment penalty. So it's like somebody . . . shooting you and then charging you for the bullet. And that's what ultimately led to the filing.

In March of 2006, the Debtor faced a liquidity crisis, and Tencara stepped in to fund the Debtor's payroll at Kulkarni's request, as well as an interest payment or early termination fee to CapSource.  Tencara received no consideration for its $295,000 advance and did not file a proof of claim for that amount.

Callan explained his reasons for advancing $295,000 to the Debtor as follows:

> [I]t's simple.  Tencara made a subordinated secured loan.  Particularly at this point in time, it was unclear whether I [sic] was in first position, meaning CapSource had swept the lockbox, paid themself [sic] off, at that point they weren't - - so obviously if the lockbox was swept, there's nothing going into the operating account of the company.  The company couldn't make payroll.

> It was still unclear to me at that point whether Tencara was in first position or in second position.  That's a difficult position to be in legally, you know, you have certain rights, and it was a little foggy as to what those rights were for this period of time.

> My primary concern has always been collateral value being paid back the loan [sic].  At that point there were discussions of whether this was going

35

to be a Chapter 11 or a Chapter 7.  The company couldn't afford a Chapter
11.  So liquidation was the only option.

I said, "Why don't we do a hybrid?"  That's what I call it.  Done it
before.  Where you fund limited, or somebody funds limited operations and
you try and get very quickly at liquidation at an auction, a bankruptcy
auction, closer to a going concern value.  So that's what we did.

I did that pre-transaction with the company, I did it post-transaction
with the trustee.  I in fact paid the trustee's fee.  I released collateral to pay
that fee to you know, make sure that this was an orderly sale in a distressed
liquidation.

In conjunction with Tencara's decision to fund payroll, Callan testified that, in

March of 2006, there were discussions about who the Debtor's key employees were.  Callan

indicated that he had "a very strong feeling" that the head of sales and the individual who

was single-handedly responsible for managing the parts department should be retained,

consistent with his view that the small parts department was critical to the success of the

Debtor's business.  Except for that one instance, Callan testified that he was not involved

in the Debtor's day-to-day operations.  He also testified that he was not a director, officer,

employee or equity interest holder of WPS, Inc. or the Debtor.  Although Tencara received

warrants in conjunction with the 2005 Transaction, Callan testified that he had no

agreements, written or otherwise, with Kulkarni or the Debtor.  He denied surreptitiously

holding his equity interest for Kulkarni; he denied exerting control over the Debtor's voting

stock; he denied exerting managerial control over the Debtor; and he denied making any

decisions as to which creditors of the Debtor should be paid.  He further denied interfering

with the Debtor's operations or misleading creditors to Tencara's advantage or to their

detriment.  Additionally, Callan testified that he believed that the Debtor was better off than its predecessor because Parthenon Capital's notes were extinguished.  He indicated that as managing member of Tencara he intended Tencara's loan to be debt, not an equity infusion of capital.

Kulkarni corroborated Callan's testimony.  He indicated that the Debtor considered its obligation to Tencara to be a debt and that the obligation was listed in the Debtor's books and records as a debt.  Kulkarni added that he personally had no side agreements of any kind with Tencara.  He also testified that he did not make any decisions on behalf of the Debtor which were motivated by his friendship with Callan or which disadvantaged other creditors or stakeholders of the Debtor for the purpose of conveying any advantage to Tencara or Callan.

G. The Expert Opinions

1. Keith D. Lowey, CPA

Lowey, the Trustee's expert witness, determined that the financial condition and working capital of WPS, Inc., the Debtor's predecessor, deteriorated in the years preceding the 2005 Transaction.  He opined that following the 2005 Transaction and Tencara's secured loan, the Debtor was undercapitalized.  In his expert report, he stated:

> The severity of the undercapitalization ultimately led to the Debtor's business failure.  What's more, the Transaction adversely affected the Debtor's financial position by leaving it with associated expenses and reorganization costs that exceeded $2 million. . . .

Lowey added:

It should have been apparent to any commercially-minded business person that three years of deteriorating financial results prior to the Transaction, in conjunction with 1) an absence of a working capital infusion from the Advance [Tencara's loan] when it was well-recognized that there was an immediate need for $500,000-$750,000 of working capital and 2) an inability to obtain alternative financing, would leave the Debtor undercapitalized and its creditors at risk from its certain business failure.

2. Stephen Darr, CPA

Stephen Darr ("Darr"), Tencara's expert witness, opined that the financial forecasts prepared by WPS, Inc. reflected sufficient available capital, including available financing, after the 2005 Transaction with which to conduct its business and that Tencara was justified in relying on those forecasts and that the U.S. operation of WPS, Inc. were better off financially after the 2005 Transaction than before the transaction. Darr analyzed the five factors set forth in IRC section 385(b), 26 U.S.C. § 385(b),[20] and the eleven factors set forth

---

[20] That section provides in relevant part, the following:

(b) Factors.--The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors:

(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

(2) whether there is subordination to or preference over any indebtedness of the corporation,

(3) the ratio of debt to equity of the corporation,

(4) whether there is convertibility into the stock of the

38

in <u>Roth Steel Tube Co. v. Comm'r of Internal Revenue</u>, 800 F.2d 625 (6th Cir. 1986), *cert.*

*denied*, 481 U.S. 1014 (1987),[21] and rebutted certain of Lowey's conclusions, particularly his

assumption that the intercompany debt with respect to the $14 million Parthenon Capital

notes must be reclassified as equity.  Darr concluded that the intercompany obligations

were properly classified as debt, until they were forgiven as part of the 2005 Transaction.

Additionally, he challenged Lowey's assertion that the 2005 Transaction adversely affected

the Debtor's financial position due to its "expenses and reorganization costs that exceeded

$2 million." Darr summarized the disbursements reflected on the Receipt and

Disbursement Statement prepared by Lawyers Title Insurance Company, reproduced

---

corporation, and

(5) the relationship between holdings of stock in the
corporation and holdings of the interest in question.

26 U.S.C. § 365(b).

[21] Those factors are:

(1) the names given to the instruments, if any, evidencing the
indebtedness; (2) the presence or absence of a fixed maturity date and
schedule of payments; (3) the presence or absence of a fixed rate of interest
and interest payments; (4) the source of repayments; (5) the adequacy or
inadequacy of capitalization; (6) the identity of interest between the
creditor and the stockholder; (7) the security, if any, for the advances; (8)
the corporation's ability to obtain financing from outside lending
institutions; (9) the extent to which the advances were subordinated to the
claims of outside creditors; (10) the extent to which the advances were
used to acquire capital assets; and (11) the presence or absence of a sinking
fund to provide repayments.

800 F.2d at 630 (citations omitted). *See also* <u>Bayer Corp. v. MasoTech, Inc. (In re
AutoStyle Plastics, Inc.)</u>, 269 F.3d 726, 749-50 (6th Cir. 2001).

above, but he appears to have unintentionally omitted the single largest disbursement after

the loan payoff to General Electric Capital Corporation, namely the $1,952,988.58 payment

to Parthenon Investors II, LP.

Darr also challenged Lowey's conclusion that it should have been apparent that the

Debtor would be left undercapitalized. He highlighted CapSource's decision to finance the

2005 Transaction, "the essence of . . . which was a transfer of the business to a new

corporate structure with a vastly improved capital structure and the fact that the Debtor

did seek and obtain financing both at the time of the Transaction (from both CapSource and

Tencara), as well as subsequently (from NL Ventures)."

## III. DISCUSSION

A. Applicable Law

1. Recharacterization

This Court need not write on a clean slate with respect to a trustee's assertion that

a purported debt be recharacterized as equity or equitably subordinated.  In Aquino v.

Black (In re AtlanticRancher, Inc.), 279 B.R. 411 (Bankr. D. Mass. 2002), this Court observed

the following:

> In Bayer Corp. v. MascoTech, Inc. ( In re Autostyle Plastics, Inc.), 269 F.3d 726
> (6th Cir. 2001), the United States Court of Appeals for the Sixth Circuit, in
> holding that a bankruptcy court may recharacterize debt as equity,
> recognized a split of authority with respect to the power of the bankruptcy
> court to recharacterize debt as equity. *Compare* In re Pacific Express, Inc., 69
> B.R. 112, 115 (9th Cir. BAP 1986) (no specific provision of the Bankruptcy
> Code that allows courts to recharacterize claims); In re Pinetree Partners,
> Ltd., 87 B.R. 481, 491 (Bankr. N.D. Ohio 1988) (same) *with* In re Herby's
> Foods, 2 F.3d 128, 133 (5th Cir. 1993)(bankruptcy court is authorized to

40

recharacterize a loan as equity contribution even in the absence of grounds
for equitable subordination); <u>Fett v. Moore (In re Fett Roofing & Sheet Metal
Co., Inc.)</u>, 438 F.Supp. 726, 729-30 (E.D. Va.1977) ("a bankruptcy court, sitting
as a court of equity, will disregard the outward appearances of the
transaction and determine its actual character and effect"); <u>Herzog v.
Leighton Holdings, Ltd. ( In re Kids Creek Partners)</u>, 212 B.R. 898, 931 (Bankr.
N.D. Ill. 1997)(recognizing separate cause of action from equitable
subordination); <u>In re Cold Harbor Assocs.</u>, 204 B.R. 904, 915 (Bankr. E.D. Va.
1997) (court "is not required to accept the label of 'debt' or 'equity' placed by
the debtor upon a particular transaction, but must inquire into the actual
nature of a transaction to determine how best to characterize it."); <u>Blasbalg
v. Tarro (In re Hyperion Enterprises)</u>, 158 B.R. 555, 561 (D. R.I.
1993)(articulating 10 factors for evaluating recharacterization); <u>Diasonics Inc.
v. Ingalls</u>, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990)(articulating Eleventh
Circuit Standard set forth in <u>N & D Properties, Inc.</u>, 799 F.2d 726 (11th Cir.
1986), for recharacterization). *See also* James H.M. Sprayregen, Jonathan
Friedland, and Marc J. Carmel, "Recharacterization from Debt to Equity: Do
Bankruptcy Courts Have the Power?" 5 Bankr. Strategist 1 (March
2002)(citing <u>In re Outboard Marine Corp.</u>, No. 00 B 37405, 2002 WL 571661
(Bankr. N.D. Ill. Jan. 14, 2002)(no basis in bankruptcy law for
recharacterization of debt as equity)). According to the Sixth Circuit, "[t]he
source of the court's general equitable powers is § 105 of the Code." 269 F.3d
at 748.

<u>In re AtlanticRancher, Inc.</u>, 279 B.R. at 431-32 (footnote omitted). Since <u>AtlanticRancher</u>,

several circuit courts have addressed issues raised by the recharacterization of debt,

universally concluding that the bankruptcy court has the inherent authority to properly

characterize a purported claim as debt or equity.

In <u>In re Official Comm. of Unsecured Creditors for Dornier Aviation (North
America), Inc.</u>, 453 F.3d 225 (4th Cir. 2006), the United States Court of Appeals for the

Fourth Circuit considered a recharacterization claim made by the Official Committee of

Unsecured Creditors in the following factual context:

Dornier Aviation (North America) (DANA) is a wholly-owned

indirect subsidiary of Fairchild Dornier GMBH (GMBH), a German aircraft
manufacturer. GMBH sold spare parts to DANA so that DANA could
provide warranty and provisioning support to GMBH customers; DANA
also resold some of these parts to non-warranty end users for a profit. GMBH
billed DANA with specific invoices for the parts it sent; these invoices
indicated that payment was due within 30 days "unless otherwise agreed."
In addition, during annual reconciliations, GMBH and DANA typically
signed a "statement of account" that detailed the amounts that DANA owed
GMBH. However, despite these written agreements, evidence produced at
trial demonstrated that DANA did not pay the invoices within 30 days. In
fact, Thomas Brandt, GMBH's Chief Financial Officer, testified that DANA
and GMBH had an agreement that DANA did not have to repay GMBH
"until the whole operation turned positive." Brandt also testified that GMBH
treated DANA "specially" because GMBH viewed its relationship with
DANA as "a market investment" designed to expand its access to the North
American market. Although Brandt explained that GMBH did expect DANA
to repay its debts eventually, he also explained that there was no fixed
maturity date and that GMBH would not seek repayment until DANA
became profitable.

453 F.3d at 229-30 (footnotes omitted).   In 2002 some of DANA's former employees

commenced an involuntary petition against it.   Although DANA converted the involuntary

Chapter 7 case to a case under Chapter 11 and attempted to reorganize its affairs, its

reorganization attempt failed, and it obtained confirmation of a liquidating plan which was

confirmed in 2003.   453 F.3d at 230.   GMBH filed a proof of claim seeking approximately

$146 million.  Before trial, the bankruptcy court recharacterized about $44 million as equity.

After trial, the court reduced GMBH's remaining claim and recharacterized another

substantial portion of the claim as equity, although it rejected the committee's equitable

subordination argument.   GMBH appealed the recharacterization determination, arguing,

among other things, that the bankruptcy court lacked the power to recharacterize claims

and erred in applying the recharacterization doctrine to GMBH's claim.   Id.   Both the

district court and the United States Court of Appeals for the Fourth Circuit affirmed the

bankruptcy court's decision.  The Fourth Circuit expressly stated that "recharacterization

is well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the

application of the priority scheme laid out in § 726." Id. at 231.  It observed:

> In the present case, GMBH presented evidence of a claim arising out
> of the spare parts transactions between GMBH and DANA. The bankruptcy
> court initially determined that a portion of this claim met the formal
> requirements sufficient to support allowance under § 502(b). The allowance
> inquiry required the bankruptcy court to determine whether there is support
> in fact and law for a payment of any kind from the bankruptcy estate to the
> claimant. However, the court correctly noted that the allowance
> determination "does not end the inquiry." The recharacterization inquiry
> then required the court to determine whether the spare parts claim was truly
> a loan or was instead a capital contribution. The Bankruptcy Code mandates
> that debt receive a higher priority than equity in distribution. See 11 U.S.C.
> § 726. Thus, even if a claimant is able to meet § 502's minimal threshold for
> allowance of the claim, the bankruptcy court still must look beyond the form
> of the transaction to determine the claim's proper priority.

Id. at 232.  The United States Court of Appeals for the Fourth Circuit added that, in holding

that recharacterization is "integral to the consistent application of the Bankruptcy Code," it

joined every other circuit to have considered the issue. Id. at 233 (citing Cohen v. KB

Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 454 (3d Cir. 2006);

Sender v. The Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.), 380 F.3d 1292,

1297 (10th Cir. 2004); and In re AutoStyle Plastics, Inc., 269 F.3d at 747-48).  Furthermore,

it adopted the eleven factor test articulated by the Sixth Circuit in AutoStyle Plastics, noting

that "they [the factors] all speak to whether the transaction 'appears to reflect the

43

characteristics of . . . an arm's length negotiation.'"[22] In re Official Committee of Unsecured

Creditors for Dornier Aviation (North America), Inc., 453 F.3d at 234.  The court, however,

recognized, that the "test is a highly fact-dependent inquiry that will vary in application

from case to case."  Id. at 234. The Fourth Circuit added, in an observation particularly

germane to the instant case:

> None of these factors is dispositive and their significance may vary
> depending upon circumstances." Hedged-Invs., 380 F.3d at 1298-99. As the
> court noted in SubMicron Systems, "[n]o mechanistic scorecard suffices. And
> none should, for Kabuki outcomes elude difficult fact patterns." 432 F.3d at
> 456. We think it important to note that *a claimant's insider status and a debtor's*
> *undercapitalization alone will normally be insufficient to support the*
> *recharacterization of a claim.* In many cases, an insider will be the only party

---

[22] *See* note 21 *supra.*  The Third Circuit in Cohen v. KB Mezzanine Fund, LP (In re
SubMicron Sys. Corp.), 432 F.3d 448 (3d Cir. 2006), recognized that the Courts of Appeal
for the Eleventh and Fifth Circuits have employed thirteen factors in the tax context.
These factors are:

> (1) the names given to the certificates evidencing the indebtedness; (2) the
> presence or absence of a fixed maturity date; (3) the source of payments;
> (4) the right to enforce payment of principal and interest; (5) participation
> in management flowing as a result; (6) the status of the contribution in
> relation to regular corporate creditors; (7) the intent of the parties; (8)
> "thin" or adequate capitalization; (9) identity of interest between creditor
> and stockholder; (10) source of interest payments; (11) the ability of the
> corporation to obtain loans from outside lending institutions; (12) the
> extent to which the advance was used to acquire capital assets; and (13)
> the failure of the debtor to repay on the due date or to seek a
> postponement.

432 F.3d at 456 n.8 (citing Stinnett's Pontiac Serv., Inc. v. Comm'r, 730 F.2d 634, 638
(11th Cir. 1984), and Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972)).
*See also* Sender v. The Bronze Group, Ltd. ( In re Hedged-Invs. Assocs., Inc.), 380 F.3d
1292, 1297 (10th Cir. 2004).

willing to make a loan to a struggling business, and recharacterization should
not be used to discourage good-faith loans. However, when other factors
indicate that the transaction is not a loan at all, recharacterization is
appropriate to ensure the consistent application of the Bankruptcy Code.

Dornier Aviation, 453 F.3d at 234 (emphasis supplied).

With respect to the status of GMBH's claim, the Fourth Circuit Court of Appeals

concluded that the bankruptcy court adequately considered:

(1) GMBH's insider status, (2) "the lack of a fixed maturity date" for the
purported loan, (3) the fact that DANA would not be required to pay until
it became profitable, (4) DANA's "long history of unprofitability and the fact
that its liabilities after the corporate restructuring far exceeded its assets,"
and (5) GMBH's assumption of DANA's losses.

Id. Thus, it stated its belief that recharacterization was warranted.

In Cohen v. KB Mezzanine Fund, LP (In re SubMicron Sys. Corp.), 432 F.3d 448 (3d

Cir. 2006), the United States Court of Appeals for the Third Circuit considered an appeal

filed by Howard S. Cohen ("Cohen"), as Plan Administrator for the bankruptcy estates of

SubMicron Systems Corporation and its affiliates, who challenged the approval by the

district court of a sale of SubMicron's assets under 11 U.S.C. § 363(b) to an entity created

by Sunrise Capital Partners, LP ("Sunrise") (The reference had been withdrawn pursuant

to 28 U.S.C. § 157(d)).  The Third Circuit affirmed the decision of the district court which

had utilized a seven factor test employed by the court in In re Color Tile, Inc., 2000 WL

152129, (D. Del. Feb. 9, 2000) ("Whether a security constitutes equity or debt depends on

the interpretation of the contract between the corporation and the security holders.").  *See*

Cohen v. The KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.), 314 B.R. 314, 323

(D. Del. 2003).

According to the Third Circuit Court of Appeals,

> Sunrise negotiated directly with several-but not all - of SubMicron's creditors
> before presenting its bid to the district court.  These creditors - The KB
> Mezzanine Fund II, LP ("KB"), Equinox Investment Partners, LLC
> ("Equinox"),FN1 and Celerity Silicon, LLC ("Celerity") (collectively, the
> "Lenders") - agreed to contribute toward the purchase of SubMicron's assets
> new capital along with all of their claims in bankruptcy against SubMicron
> in exchange for equity in the entity formed by Sunrise to acquire the
> assets-Akrion LLC ("Akrion"). Akrion in turn "credit bid" the full value of
> the Lenders' secured claims contributed to it as part of its bid for
> SubMicron's assets pursuant to 11 U.S.C. § 363(k).

Id. at 451 (citing In re SubMicron Sys. Corp., 291 B.R. 314 (D. Del. 2003)).  According to the

Third Circuit, Cohen, on behalf of unsecured creditors "cut out of the deal" by the Lenders

and Sunrise, argued that the purportedly secured debt investments made by the Lenders

and contributed to Akrion should have been recharacterized as equity investments or, in

the alternative, that the district court erred by failing to determine that the debt was

unsecured, that credit bidding was permissible and that equitable subordination of the

Lenders' secured claims was unwarranted.  Id. (footnotes omitted).

The United States Court of Appeals for the Third Circuit, noting precedent for

employing the Roth Steel/AutoStyle Plastics factors, stated:

> While these tests undoubtedly include pertinent factors, they devolve to an
> overarching inquiry: the characterization as debt or equity is a court's
> attempt to discern whether the parties called an instrument one thing when
> in fact they intended it as something else. That intent may be inferred from
> what the parties say in their contracts, from what they do through their
> actions, and from the economic reality of the surrounding circumstances.
> Answers lie in facts that confer context case-by-case.

No mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns. While some cases are easy (e.g., a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored). Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

432 F.3d at 455-56.

The United States Court of Appeals for the Third Circuit rejected the Plan Administrator's arguments. It found no error in the findings of the district court which it summarized as follows:

The District Court set out numerous facts to support a debt characterization. Looking to the lending documents, it found "beyond dispute in the record that . . . the name given to the 1999 fundings was debt . . . and . . . the 1999 fundings had a fixed maturity date and interest rate." In re SubMicron Sys., 291 B.R. at 325. The Court also found evidence of the parties' intent to create a debt investment outside the lending documents. For example, it noted that "[t]he 1999 notes were recorded as secured debt on SubMicron's 10Q SEC filing and UCC-1 financing statements." Id. at 319.

The District Court could not find, on the other hand, convincing evidence to support an equity investment characterization of the 1999 Fundings. It rejected Cohen's argument that the dire financial circumstances surrounding the infusion of the 1999 Fundings supported an equity characterization. Instead, it concluded, with reference to the conflicting testimony and relative credibility of witnesses presented by both parties, that Cohen "failed to prove that[,] under SubMicron's dire circumstances, [the Lenders'] transactions were improper or unusual [as debt investments]." Id.

47

at 325. Recognizing that " '[w]hen a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital,' " id. (quoting In re AutoStyle Plastics, 269 F.3d at 746-47), the District Court also noted that "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company," id. Weighing these competing considerations, it did not find SubMicron's undercapitalization greatly supported an equity characterization. Id.

Similarly, the Court found the Lenders' participation on the SubMicron Board did not, in and of itself, provide support for an equity characterization. Again relying on expert testimony, it emphasized that it is "not unusual for lenders to have designees on a company's board, particularly when the company [is] a distressed one."Id. at 325-26. After reviewing conflicting evidence on the issue, the Court concluded that Cohen "[did] not prove[ ] that [Lenders] or their designees controlled or dominated SubMicron's Board in any way." Id. at 326. Based on these factual determinations, the conclusion was inevitable that the Lenders' representation on SubMicron's Board did not necessarily support an equity characterization.

Lastly, the Court found unpersuasive Cohen's argument that SubMicron's failure to issue notes for the 1999 Tranche Two Funding should be understood as evidence of the parties' understanding that the 1999 Fundings were, in effect, equity investments. It noted that "[t]he record is clear that SubMicron's accounting department made numerous mistakes and errors when generating notes," concluding that "[t]he fact that notes were generated for some fundings and not others is not sufficient, in and of itself, to recharacterize the 1999 fundings as equity." Id. at 326.

432 F.3d at 457-58.

In AtlanticRancher, this Court recognized the factors used by the Court in AutoSyle Plastics, as well as a shorter list set forth in Blasbalg v. Tarro (In re Hyperion Enters., Inc.), 158 B.R. 555, 561(D. R.I. 1993) (citing In re Labelle Indust., Inc., 44 B.R. 760 (Bankr. D. R.I. 1984), and Tanzi v. Fiberglass Swimming Pools, Inc., 414 A.2d 484 (R.I. 1980)), while noting

48

that "no one factor is determinative" and that undercapitalization alone is insufficient to justify recharacterization.  279 B.R. at 434.  In <u>AtlanticRancher</u>, this Court utilized the so-called <u>Hyperion</u> factors.  In view of the more recent decisions from the Fourth and Third Circuits, this Court predicts that the First Circuit would follow its sister circuits in utilizing factors culled from tax cases.  *See* <u>Roth Steel Tube Co. v. Comm'r of Internal Revenue</u>, 800 F.2d 625, 630 (6th Cir. 1986).

The Court notes, however, that the Eleventh Circuit in <u>Estes v. N & D Props., Inc. (In re N & D Props., Inc.)</u>, 799 F.2d 726 (11th Cir. 1980), adopted the following test: "Shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial under-capitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit." 799 F.2d at 733 (citing <u>In re Multiponics Inc.</u>, 622 F.2d 709 (5th Cir.1980)).  As the court observed in <u>Menotte v. NLC Holding Corp. (In re First NLC Fin. Servs., LLC)</u>, 415 B.R. 874 (Bankr. S.D. Fla. 2009),

> The Eleventh Circuit's 1986 decision in <u>N & D Properties</u> has been recognized as arguably the first Circuit Court of Appeal opinion to endorse debt recharacterization in bankruptcy. *See* My Chi To & Matthew Siegel, Debt Recharacterization Looks Back on a Good Year, 26 Am. Bankr.Inst. J. 1 (Feb. 2007). It is important to note that <u>N & D Properties</u> was in fact a case involving a loan made to a debtor by one of its shareholders. Although the Eleventh Circuit stated a test for recharacterization of a shareholder's loan in <u>N & D Properties</u>, this Court finds nothing in the opinion that would restrict recharacterization to only those loans made to a debtor by one of its shareholders.

415 B.R. at 879.  In <u>First NLC Fin. Servs. LLC</u>, the bankruptcy court, concluded:

49

>While the Eleventh Circuit stated a standard for recharacterization of a
>shareholder loan in N & D Properties, it did not prohibit recharacterization
>of non-shareholder loans in appropriate circumstances. There is likewise no
>prohibition to recharacterization of non-shareholder loans embodied in any
>of the various multi-factor tests applied in other Circuit Courts of Appeal
>and lower court recharacterization opinions.

Id. at 880.  Thus, the bankruptcy court utilized the multi-factor tests adopted by the circuit

courts of appeals in their recent decisions in determining a summary judgment motion

brought by putative lender whose loans the creditors' committee sought to recharacterize

as equity.  It recognized that other courts in the Eleventh Circuit had employed multi-factor

tests, citing, among other cases, In re Biscayne Inv. Group, Ltd., 264 B.R. 765 (Bankr. S.D.

Fla.2001)(determining recharacterization claim under thirteen factor test); In re Blevins

Concession Supply Co., 213 B.R. 185 (Bankr. M.D. Fla.1997)(determining recharacterization

claim in bankruptcy by analyzing thirteen factor test used in tax litigation); Celotex Corp.

v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 176 B.R. 223, 248

(M.D. Fla. 1994) (analyzing thirteen factor test to determine the actual manner, not the

form, in which the parties intended to structure the advance at issue).

      This Court finds that the tests employed in the  decisions of the Fourth and Third

Circuits in Dornier Aviation and SubMicron Systems, respectively, are more compelling

than the test set forth in N & D Properties, in which the court ruled that initial

undercapitalization and the absence of other disinterested lenders are the sole factors to

consider in the context of shareholder loans.  The Fourth Circuit's focus on whether the

transaction is "arms-length based on a multi-factor approach in Dornier Aviation, or the

Third Circuit's "over arching inquiry" as to intent in <u>SubMicron</u> permit a more thorough

evaluation of the substance of the challenged loan and the parties' intent than the rule

espoused by the Eleventh Circuit in <u>N & D Properties</u>.


                    2. Insider Status

        Notably, the sixth <u>AutoStyle Plastics</u> factor, namely "the identity of interest between

the creditor and the stockholder implicates the Trustee's argument that Tencara must be

considered a non-statutory insider of the Debtor.

> The term 'insider' includes . . . (B) if the debtor is a corporation - (i) director
> of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv)
> partnership in which the debtor is a general partner; (v) general partner of
> the debtor; or (vi) relative of a general partner, director, officer, or person in
> control of the debtor.

11 U.S.C. § 101(31)(B).  Because Congress used the term "includes" in § 101(31), a number

of courts have identified a category of creditors,  called "non-statutory insiders," who fall

within the definition, but outside of any of the five categories specified. *See* <u>Schubert v.</u>

<u>Lucent Techs., Inc. (In re Winstar Commc'ns), Inc.</u>, 554 F.3d 382, 395 (3d Cir. 2009) (citing

<u>Anstine v. Carl Zeiss Meditec AG (In re U.S. Med.,Inc.)</u>, 531 F.3d 1272, 1276 (10th Cir.

2008)).  The United States Court of Appeals for the Third Circuit held in <u>Winstar</u> that "it

is not necessary that a non-statutory insider have actual control; rather, the question "is

whether there is a close relationship [between debtor and creditor] and . . . anything other

than closeness to suggest that any transactions were not conducted at arm's length." 554

F.3d at 396-97 (citing <u>In re U.S. Med.</u>, 531 F.3d at 1277 and S.Rep. No. 95-989, at 25 (1978),

as reprinted in 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor.")). In In re Foothills Texas, Inc., 408 B.R. 573 (Bankr. D. Del. 2009), the bankruptcy court elaborated on whether a person or entity should be considered a non-statutory insider. It stated: "The Third Circuit's focus of inquiry is in accord with the plain meaning of insider - 'a person who is within some society, organization, etc.; a person who is a party to a secret, *esp. so as to gain an unfair advantage*." 408 B.R. at 579 (emphasis in original, citation omitted).

Tencara is a limited liability company, organized under Delaware law. Section 101(31) does not address the definition of an insider in the case of a limited liability company as it begins with the language "[i]f the debtor is a corporation." In Longview Aluminum, L.L.C. v. Brandt, 431 B.R. 193 (N.D. Ill. 2010), the district court observed:

> Under Delaware law, a corporation generally must "be managed by or under the direction of a board of directors. . . ." 8 Del.C. § 141. Thus, in referencing a director, Section 101(31)(B) was intended to refer to the party that "managed" the debtor corporation. With respect to a limited liability corporation, Delaware law states that "[u]nless otherwise provided in a limited liability company agreement, the management of a limited liability company shall be vested in its members. . . ." 6 Del.C. § 18-402. Thus, pursuant to Delaware law, directors are generally provided with authority for managing the corporation and members are generally provided with authority for managing the limited liability company.

431 B.R. 197. A managing member of a limited liability company is in an analogous position to a director of a corporation under Delaware law.

3. Equitable Subordination

52

Section 510(c) of the Bankruptcy Code defines equitable subordination and provides

in part:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and
> a hearing the court may -
>
>> (1) under principles of equitable subordination, subordinate for
>> purposes of distribution all or part of an allowed claim to all or
>> part of another allowed claim or all or part of an allowed *439
>> interest to all or part of another allowed interest; or
>>
>> (2) order that any lien securing such a subordinated claim be
>> transferred to the estate.

11 U.S.C. § 510(c).   Numerous courts, including this Court in <u>AtlanticRancher</u>, 279 B.R. at

432 (citing <u>AutoStyle Plastics</u>, 269 F.23. at 748-49), have explained the difference between

recharacterization and equitable subordination.    In <u>Dornier Aviation</u>, the United States

Court of Appeals for the Fourth Circuit succinctly explained the difference:

> [E]quitable subordination . . . differs markedly and serves different purposes
> from recharacterization. While a bankruptcy court's recharacterization
> decision rests on the substance of the transaction giving rise to the claimant's
> demand, its equitable subordination decision rests on its assessment of the
> creditor's behavior. As the Tenth Circuit has explained, when a claim is
> equitably subordinated, "[t]he funds in question are still considered
> outstanding corporate debt, but the courts seek to remedy some inequity or
> unfairness perpetrated against the bankrupt entity's other creditors or
> investors by postponing the subordinated creditor's right to repayment until
> others' claims have been satisfied." <u>Sender v. Bronze Group, Ltd. ( In re
> Hedged-Invs. Assocs., Inc.)</u>, 380 F.3d 1292, 1297 (10th Cir. 2004); *see also* <u>id.</u>
> ("The doctrine of equitable subordination, by contrast, looks not to the
> substance of the transaction but to the behavior of the parties involved.").
> Thus, although recharacterization and equitable subordination lead to a
> similar result, they "address distinct concerns" and require a bankruptcy
> court to conduct different inquiries. *See* <u>Cohen v. KB Mezzanine Fund II, LP
> ( In re SubMicron Sys. Corp.)</u>, 432 F.3d 448, 454 (3d Cir. 2006).

53

<u>Dornier Aviation</u>, 453 F.3d at 232.  Thus, a claim for equitable subordination entails a different analysis than recharacterization.

The United States Court of Appeals for the First Circuit interpreted the requirements of section 510(c) in <u>Merrimac Paper Co., Inc. v. Harrison (In re Merricmac Paper Co., Inc.)</u>, 420 F.3d 53 (1st Cir. 2005).  It held:

> Consistent with the Supreme Court's recent case law, . . . bankruptcy courts may not categorically subordinate classes of claims based on generalized policy considerations. Instead, they must exercise their equitable discretion to decide whether or not to subordinate particular claims on a case-by-case basis. Given the facts of this case, we hold as a matter of law that it was improper for the bankruptcy court, in the absence of misconduct on the part of the note holder or any other special circumstance, to impose equitable subordination on a claim that arises from a promissory note received in connection with the deferred payment of retirement benefits under an ERISA-qualified ESOP.

<u>Id.</u> at 65. In <u>AtlanticRancher</u>, this Court stated the following:

> The principles associated with the doctrine of equitable subordination are well developed in the First Circuit. *See, e.g.*, <u>Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)</u>, 968 F.2d 1332, 1353 (1st Cir. 1992); <u>Boyajian v. DeFusco ( In re Giorgio)</u>, 862 F.2d 933 (1st Cir.1988); <u>In re Clamp-All Corp.</u>, 233 B.R. 198, 211 (Bankr. D. Mass. 1999); <u>Rodolakis v. Chertoff ( In re 1236 Dev. Corp.)</u>, 188 B.R. 75, 81-83 (Bankr. D. Mass. 1995); <u>Ferrari v. Family Mutual Sav. Bank (In re New Era Packaging, Inc.)</u>, 186 B.R. 329, 335-36 (Bankr. D. Mass. 1995); <u>In re Beverages International Ltd.</u>, 50 B.R. 273, 280 (Bankr. D. Mass. 1985). *See also* <u>Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)</u>, 926 F.2d 1458 (5th Cir. 1991); and <u>Benjamin v. Diamond (In re Mobile Steel Co.)</u>, 563 F.2d 692, 699-700 (5th Cir. 1977). Courts in Massachusetts have adopted the widely-accepted test for equitable subordination articulated by the Fifth Circuit.

<u>AtlanticRancher</u>, 279 B.R. at 439.  This Court added:

> In <u>In re Fabricators, Inc.</u>, 926 F.2d 1458 (5th Cir. 1991), the Fifth Circuit

reiterated its three-prong test for equitable subordination first set forth in
Mobile Steel as follows:

> (1) the claimant must have engaged in some type of inequitable
> conduct; (2) the misconduct must have resulted in injury to the
> creditors or conferred an unfair advantage on the claimant; and
> (3) equitable subordination of the claim must not be
> inconsistent with the provisions of the Bankruptcy Code.

926 F.2d at 1464-65 (citing Benjamin v. Diamond (In re Mobile Steel Co.), 563
F.2d 692, 700 (5th Cir. 1977)).

AtlanticRancher, 279 B.R. at 439.[23]  In Capital Bank & Trust Co. v. 604 Columbus Ave.

Realty Trust (In re 604 Columbus Ave. Realty Trust), 968 F.2d 1332 (1st Cir. 1992), the

United States Court of Appeals for the First Circuit, also citing In re Fabricators, Inc., 926

F.2d 1458 (5th Cir. 1991), elaborated on the test as follows:

> Although the remedy of equitable subordination has been applied relatively
> infrequently, it is usually directed towards misconduct arising in three
> situations: when a fiduciary of the debtor misuses his position to the
> disadvantage of other creditors; when a third party dominates or controls the
> debtor to the disadvantage of others; or when a third party defrauds the
> other creditors.

968 F.2d at 1359-60.  The First Circuit added:

> Whether the creditor is an insider or fiduciary of the debtor is fundamentally
> important to the level of scrutiny that courts apply to allegations of
> misconduct against a creditor. See In re Fabricators, Inc., 926 F.2d 1458, 1465
> (5th Cir. 1991). See also DeNatale & Abram at 424 ("The creditor's duty of fair
> dealing is increased in the precise degree that the creditor has power and

---

[23] Without a showing of inequitable conduct, the remaining two prongs of the
test are inapplicable. See In re Hoffinger Indus., Inc., 327 B.R. 389, 415 (Bankr. E.D. Ark.
2005) (citing In re Lifschultz Fast Freight, 132 F.3d 339, 344 (7th Cir. 1997); In re Bellanca
Aircraft Corp., 850 F.2d 1257, 1282-83 (8th Cir. 1988); Farmers Bank of Clinton v. Julian,
383 F.2d 314, 323 (8th Cir. 1967) ("'fraud or unfairness' (unfairness is equated with
inequity) is essential for a decision to subordinate")).

control over the debtor's affairs."). Claims arising from dealings between a debtor and an insider are rigorously scrutinized by the courts. <u>Fabricators</u>, 926 F.2d at 1465. On the other hand, if the claimant is not an insider, "then evidence of more egregious misconduct such as fraud, spoliation or overreaching is necessary." <u>Id.</u> (citing <u>In re N & D Properties, Inc.</u>, 799 F.2d 726 (11th Cir. 1986)). *See also* <u>In re Friedman</u>, 126 B.R. 63, 71-72 (Bankr. 9th Cir. 1991) (same principle).

<u>604 Columbus Ave. Realty Trust</u>, 968 F.2d at 1360.[24]  If the creditor is not an insider, the

First Circuit Court of Appeals observed:

> Courts have struggled to define precisely the misconduct necessary to support equitable subordination against a creditor who is not an insider. Fraud or misrepresentation are the most frequent justifications for equitable subordination of the noninsider. They are not, however, required:
>
> > Something less than actual fraud . . . will suffice. The fixing of the lower limit is the elusive boundary which cannot be clearly defined. Although the courts have used general terms such as injustice or unfairness to fix this lower limit, the minimum level of offending conduct appears to be conduct that shocks the conscience of the court. . . .
>
> DeNatale & Abram at 423-24. Types of misconduct sufficient to warrant equitable subordination against non-insiders have included instances of "[v]ery substantial misconduct involving moral turpitude or some breach or some misrepresentation where other creditors were deceived to their damage . . . or gross misconduct amounting to overreaching. . . ." <u>In re Mayo</u>, 112 B.R. 607, 650 (Bankr. D. Vt.1990) (citations omitted). For the most part, courts have been reluctant to find the requisite level of misconduct in arms-length dealings between borrowers and lenders.

<u>In re 604 Columbus Ave. Realty Trust</u>, 968 F.2d at 1361 (footnotes omitted). [25]

---

[24] The First Circuit referenced A. DeNatale and P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law. 417, 430-45 (1985).

[25] The United States Court of Appeals for the First Circuit cited decisions in which courts determined that equitable subordination was unwarranted: <u>In re Pacific</u>

B. Analysis

1. Insider Status

The Trustee asserts that Tencara is a non-statutory insider of Debtor.  That
argument is premised upon Callan's position as sole managing member of Tencara, and
Callan's close personal and business relationships with Kulkarni, who was the 100% owner
and Chairman of the Board of Directors of WPS, Inc. until 2001 when he relinquished
ownership and control over the day-to-day operations of the Debtor's predecessor to
Parthenon Capital pursuant the Limited Liability Company Agreement for Wolverine
Proctor, LLC executed in conjunction with the 2001 Transaction, leaving him with an
ownership of 1,000 Class A shares of Wolverine Proctor, LLC.  Although he retained his
position as Chairman of the Board of Directors and was a party to a lucrative consulting
agreement, Parthenon Capital, through its dominant position on the Board of Managers of
Wolverine Proctor, LLC and on the Board of Directors of Wolverine Proctor, Inc., was in

---

Express, Inc., 69 B.R. 112, 117-18 (B.A.P. 9th Cir. 1986) (creditors' loan agreement with
debtor, which effectively shifted risk of loss to other creditors, was not "the type of
overreaching, fraud or other conduct which would justify subordination of a
non-insider's claim"); In re Dry Wall Supply, Inc., 111 B.R. 933, 937-39 (D. Colo. 1990)
(rejecting equitable subordination based on allegations that creditor knew that loan
transaction would render borrower insolvent); In re Pinetree Partners, Ltd., 87 B.R. 481,
490 (Bankr. N.D. Ohio 1988) (lender's refusal to provide additional credit and
threatened foreclosure of debtor's mortgage not sufficiently egregious to warrant
equitable subordination).  Thus, as the First Circuit recognized in 604 Columbus Ave.
Realty Trust, the bankruptcy court lacks "a general license to weigh the moral quality of
each debt or to compare creditors in terms of moral worth; rather it indicates that the
bankruptcy court may equitably subordinate those debts, the creation of which was
inequitable vis-a-vis other creditors." Id. at 1360.

charge of the operations of WPS, Inc., not Kulkarni.

Prior to the 2005 Transaction, which can best be described as a leveraged buy-out of WPS, Inc. by entities controlled by Kulkarni, Tencara had no relationship with the Debtor because the Debtor corporation was not formed until December 1, 2004, shortly before February 11, 2005, the date of the 2005 Transaction. Indeed, because Capital Asset Management, LLC presented a term sheet, dated August 23, 2004, which was amended on October 12, 2004, Tencara, as a separate entity, did not have a relationship with Kulkarni until sometime after October 12, 2004. Thus, for this Court to conclude that Tencara is an insider of the Debtor, the Court, in effect, would have to pierce the veil of Callan's limited liability company, Tencara, and concomitantly do the same with respect to the Debtor and Kulkarni. In other words, the Court would be required to find that both Callan and Kulkarni were simply alter egos of their respective concerns and to impute motives to their limited liability companies, which, in spite of their testimony, may have arisen from their close business and personal relationship. The Court would have to reach that conclusion even though prior to the 2005 Transaction, pursuant to which Tencara lent the Debtor $1.9 million, Callan, as sole owner and managing member of Tencara, and Kulkarni, as sole owner and managing member of the Debtor, actually negotiated the terms of Tencara's subordinated loan for a period of only ten weeks.

The thrust of the Trustee's argument that Tencara is an insider of the Debtor is the close personal friendship and working relationship between Callan and Kulkarni which began in the fall of 2003 and continues to this day, as well as Callan's alleged lack of

58

extensive due diligence on behalf of Tencara with respect to the 2005 Transaction. According to the Trustee, because Tencara must be considered a non-statutory insider of the Debtor, the Court is required to subject Tencara's loan to closer scrutiny than if Tencara is not determined to be an insider.

The Trustee's argument as to Tencara's insider status is logically flawed. It rests on the assumptions that both limited liability companies, Tencara and the Debtor, were alter egos of their respective managing member, as no debtor/creditor relationship existed between Callan and Kulkarni, except with respect to the $75,000 personal loan.[26] Under the Delaware Limited Liability Company Act, however, members and managers have no liability for their activities relating to the limited liability company in which they have interests, and, by extension, should not have the personality and motives of their members imputed to their limited liability companies.

Delaware law provides:

> Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

---

[26] "A limited liability company (LLC) is a hybrid business entity that offers its members limited liability as if they were shareholders of a corporation, but treats the entity and its members as a partnership for tax purposes." *See generally* Ann K. Wooster, Annotation, *Construction and Application of Limited Liability Company Acts - Issues Relating to Personal Liability of Individual Members and Managers of Limited Liability Company as to Third Parties*, 47 A.L.R. 6th 1 (2009).

Del. Code Ann. tit. 6, § 18-303(a).   According to the court in <u>Nibbi v. Kilroy (In re Kilroy)</u>, 357 B.R. 411 (Bankr. S.D. Tex. 2006), "[u]nder Delaware law, numerous factors are important to an alter ego analysis, 'but no single factor can justify a decision to disregard the corporate entity.'" <u>Id.</u> at 428 (quoting <u>Alberto v. Diversified Group, Inc.</u>, 55 F.3d 201, 205 (5th Cir.1995), and <u>Harco Nat'l Ins. Co. v. Green Farms, Inc.</u>, 1989 WL 110537, at *5 (Del. Ch. 1989)). Those factors include:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general the corporation simply functioned as a facade for the dominant shareholder.

<u>Id.</u> at 428 (citations omitted).   According to the United States Court of Appeals for the Second Circuit, "To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . is present.'" <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1457 (2nd Cir.1995)(quoting <u>Harper v. Del. Valley Broadcasters, Inc.</u>, 743 F.Supp. 1076, 1085-86 (D. Del. 1990)). *See* <u>In re Kilroy</u>, 357 B.R. at 428.

Similarly, Massachusetts courts have signaled the importance of observing corporate formalities and by extension those relating to limited liability companies.  In <u>Zimmerman v. Puccio</u>, 613 F.3d 60 (1st Cir. 2010), the United States Court of Appeals for the First Circuit observed:

> [W]e tread carefully when determining whether it is appropriate to put aside the basic tenet of corporate law that "corporations-notwithstanding

> relationships between or among them-ordinarily are regarded as separate
> and distinct entities," Scott v. NG U.S. 1, Inc., 450 Mass. 760, 881 N.E.2d 1125,
> 1131 (2008), and thereby to "allow a plaintiff to pierce the corporate veil
> of limited liability." In re Ontos, Inc., 478 F.3d 427, 432 (1st Cir. 2007). In
> Massachusetts, "the corporate veil will only be pierced in rare situations."
> Birbara v. Locke, 99 F.3d 1233, 1239 (1st Cir.1996). Such situations do occur,
> however, and Massachusetts has recognized that it is the "right and the duty
> of courts to look beyond the corporate forms" when necessary "for the defeat
> of fraud or wrong, or the remedying of injustice." Hanson v. Bradley, 298
> Mass. 371, 10 N.E.2d 259, 264 (1937) (quoted in Scott, 881 N.E.2d at 1132).
>
>> Massachusetts has identified as relevant to the veil-piercing analysis
>> a set of twelve factors. They are: "(1) common ownership; (2) pervasive
>> control; (3) confused intermingling of business assets; (4) thin capitalization;
>> (5) nonobservance of corporate formalities; (6) absence of corporate records;
>> (7) no payment of dividends; (8) insolvency at the time of the litigated
>> transaction; (9) siphoning away of corporation's funds by dominant
>> shareholder; (10) nonfunctioning of officers and directors; (11) use of the
>> corporation for transactions of the dominant shareholders; and (12) use of the
>> corporation in promoting fraud." Att'y Gen. v. M.C.K., Inc., 432 Mass. 546,
>> 736 N.E.2d 373, 381 n. 19 (2000).

Zimmerman v. Puccio, 613 F.3d at 73-74 (footnotes omitted). *See also* My Bread Baking Co.

v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 751-52 (1968).

Although the standards for piercing the corporate veil are articulated most

frequently with respect to corporations, this Court concludes that the same principles

would apply for alter ego liability to attach to members of limited liability companies. *Cf.*

In re Giampietro, 317 B.R. 841, 847-48 and n. 9 (Bankr. D. Nev. 2004) (citing cases).  Thus,

under either Delaware or Massachusetts law, for this Court to consider as relevant the close

business and personal relationship of Callan and Kulkarni, the Court would have to

conclude that the limited liability companies through which they operated failed to observe

appropriate formalities and simply functioned as a facade or alter ego of  their managing

members.  The Trustee did not specifically address, let alone establish by a preponderance of the evidence, that Tencara should be viewed as a mere instrumentality of Callan for purposes of imputing Callan's relationship with Kulkarni to Tencara for purposes of non-statutory insider status.  She presented no evidence with respect to Tencara's capitalization or record keeping.  She presented no evidence that it failed to observe appropriate formalities.  Additionally, she did not assert that Kulkarni was the alter ego of the Debtor.  Indeed, she did not commence an action against Callan, individually, and she did not sue Kulkarni, individually, with respect to the 2005 Transaction, although she has sued Kulkarni for breach of fiduciary duty with respect to certain payments and transfers.

Callan was the sole member of Tencara and concededly was in control of its affairs.  He personally loaned Kulkarni $75,000 in conjunction with CapSource's required commitment fee in anticipation of the 2005 Transaction, and he used various entities, such as Capital Asset Management, LLC, as investment vehicles and employed one master account with various sub-accounts for his investment companies.  The Court finds that these circumstances, without more, are insufficient for a determination that he was the alter ego of Tencara.  The Trustee did not establish that Callan used Tencara to perpetrate a fraud on the Debtor or any creditors of the Debtor.  Thus, this Court cannot ignore Tencara as a separate entity and cannot impute Callan's business and personal relationship with Kulkarni to it for purposes of finding non-statutory insider status.

Similarly, this Court was not asked to find that the Debtor was a mere instrumentality of Kulkarni, and there was no such proof, although Kulkarni's use of the

Debtor to transfer funds to the UK operations makes the issue with respect to him a closer question.  This Court cannot disregard the limited liability company entities through which the 2005 Transaction was effectuated without the appropriate parties, pleadings, argument, and proof.

As the United States Court of Appeals for the Third Circuit observed in <u>In re Winstar Commc'ns, Inc.</u>, 554 F.3d at 396-97, non-statutory insider status hinges on the close relationship between the debtor and the creditor and "'anything other than closeness to suggest that the transaction was not conducted at arm's length.'" (quoting <u>Anstine v. Carl Zeiss Meditec AG (In re U.S Med., Inc.)</u>, 531 F.3d 1272, 1277 (10th Cir. 2008)).  As noted above, Tencara, as a separate and distinct entity, did not have a close personal or business relationship with the Debtor or Kulkarni, as the Debtor did not exist until a short period of time before the 2005 Transaction.

In this regard, the Court finds that Tencara's due diligence, though not as extensive as that of a traditional institutional lender, was sufficient.  Callan on behalf of Tencara, testified that his focus was on the value of the WPS, Inc.'s collateral which the Debtor was acquiring.  His discussions with Constable and Kulkarni provided him with an adequate, if not comprehensive, understanding of the business that Kulkarni intended to acquire.  Although neither he nor Kulkarni understood the extent of the  underfunded pension liabilities that were to be assumed by the Debtor, Callan, on behalf of Tencara, reviewed balance sheets and cash flow projections prepared by or for Kulkarni.   While the assumptions underlying the financial documents he reviewed may have been unduly

optimistic, Callan was able to determine that the small parts component of WPS, Inc.'s business was extremely valuable, and he was informed and approving of Kulkarni's plans to outsource manufacturing to India, thereby reducing manufacturing costs.  Indeed, the Debtor's assets were sold in the Debtor's bankruptcy case for $8.2 million.

### 2. Recharacterization of Debt

Having concluded that Tencara was  not an insider of the Debtor, the Court must determine the proper characterization of its claim.  Applying the eleven factors set forth in the decision of the Third, Fourth and Sixth Circuit Courts of Appeal, *see* In re Official Comm. of Unsecured Creditors of Dornier Aviation (North America), Inc., 453 F.3d at 234; In re SubMicron Sys. Corp., 432 F.3d at 456 n. 8; In re AutoSyle Plastics, Inc., 269 F.3d at 749-50, and, in the absence of controlling precedent from the United States Court of Appeals for the First Circuit, the Court concludes that the Debtor's obligation to Tencara is properly characterized as debt.

Even if this Court were to assume that Tencara was an insider, however, the Court's conclusion would remain the same.  Utilization of the multi-factor approach, together with the recognition that "[n]o mechanistic scorecard suffices," *see* Dornier Aviation, 453 F.3d at 234 (citing SunMicron Systems, 432 F.3d at 456), and that undercapitalization alone is not determinative, Atlantic Rancher, 279 B.R. at 434 (citing In re Hyperion Enters., Inc., 158 B.R. at 561, compels the Court to conclude that even if it were to find that Callan and Tencara could be considered insiders of the Debtor, the lack of any indicia of control exerted by Tencara in the affairs of the Debtor and Callan's approach to his due diligence on behalf

64

of Tencara strongly supports Callan's testimony that Tencara made the $1.9 million loan to the Debtor based on an assessment of collateral values, as well as cash flow.

The business of WPS, Inc. was cyclical. Beginning in 1998 and continuing through 2001, its revenue declined resulting in a liquidity crisis. Kulkarni considered, among its limited options, the commencement of a bankruptcy case at that time. Instead, a recapitalization was completed with the infusion of $14 million from Parthenon Capital and the write off of $10 million in debt owed to Citizens Bank of Massachusetts. Again, beginning in 2003, the Debtor's predecessor, WPS, Inc., confronted severe financial problems, as noted by BGL in its Confidential Executive Summary and, in 2005, Parthenon Capital considered the commencement of a bankruptcy case. Despite a gloomy assessment of WPS, Inc.'s problems, BGL, not surprisingly in view of the reasons for its engagement, identified recent bookings and steady order growth as grounds for optimism - - optimism that Kulkarni shared in view of his decision to procure financing from CapSource and Tencara to re-acquire the business.

In addition to Kulkarni's negotiations with CapSource, CapSource and Tencara entered into negotiations with respect to financing the Debtor. The negotiations among the parties ultimately led to the 2005 Transaction, pursuant to which Kulkarni personally guaranteed the Debtor's obligations to CapSource and Tencara became the Debtor's subordinated lender. The Debtor executed a Secured Promissory Note, a Security Agreement, and a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing in favor of Tencara, as well as a Subordination Agreement. Accordingly, the

Court concludes that the names given to the instruments and the context in which they were produced and executed unequivocally demonstrate that Tencara intended to lend money to the Debtor, not invest in it.

Additionally, applying the multi-factor test, the Secured Promissory Note executed by the Debtor in favor of Tencara contained a fixed maturity date, a fixed rate of interest, as well as a default rate of interest, and a schedule for the payment of interest. The Debtor was the source of payments, and it timely made all required payments. Indeed, it is undisputed that the Debtor did not default on the interest payments to Tencara, a circumstance reflected in Tencara's proof of claim.

A comparison of the treatment afforded Parthenon Capital's secured claims with the treatment of Tencara's secured claim reinforces the result of the multi-factor analysis. Following WPS, Inc.'s execution of six promissory notes in favor of Parthenon Capital, Parthenon Capital contributed those notes to Wolverine Proctor, LLC in conjunction with the Limited Liability Company Agreement executed by Parthenon Capital and Kulkarni. In contrast, Tencara retained its Secured Promissory Note, although it released its liens to effectuate the Sales and Leaseback Transaction to NL Ventures. WPS, Inc. made no interest payments to Parthenon Capital under its notes, and Parthenon Capital did not cause Wolverine Proctor, LLC to make demand upon WPS, Inc. for their payment. In contrast, the Debtor timely made all payments to Tencara pursuant to the terms of the Secured Promissory Note.

Additionally, Parthenon Capital controlled Wolverine Proctor, LLC, which owned

66

all the stock of Wolverine Proctor, Inc., and thus indirectly managed and controlled WPS,

Inc.  Its ownership stake and exercise of control over business decisions, including the

decision to engage BGL, stands in sharp contrast to Tencara's position vis à vis the Debtor.

The Court accepts Lowey's assessment that Parthenon Capital's $14 million advance

to WPS, Inc. was an equity interest, a view shared by Kulkarni as he engaged counsel to

draft a complaint for filing in the Suffolk Superior Court, Department of the Trial Court.

Accordingly, the distribution of $2 million to Parthenon Capital as part of the 2005

Transaction was unwarranted as both Lowey and Kulkarni were undoubtedly correct in

their view that Parthenon Capital was an investor, not a lender.

Addressing the fifth factor and the one which the parties recognized as critical,

namely the adequacy of capitalization, the Court concludes that the Debtor was

undercapitalized at its inception.  The overwhelming weight of the evidence established

that the cash flow of the Debtor and its predecessor, WPS, Inc., was compromised before

and after the 2005 Transaction.  Following the 2005 Transaction, the Debtor did not have

sufficient capital to conduct normal business operations and timely pay its creditors

because of cash flow problems.  Although it had obtained a revolving credit facility from

CapSource, the stringent conditions of the line of credit, together with the absence of a

good working relationship with CapSource's lending team, the lack of an EX-IM facility,

as well as outside the ordinary course of business payments to Wolverine Proctor &

Schwartz, Ltd.'s successor,[27] adversely affected the Debtor's cash flow.  Prior to the 2005

Transaction, WPS, Inc. failed to cause interest payments to Parthenon Capital to be made

with respect to the notes held by Wolverine Proctor, LLP.  Additionally, the Debtor used

the proceeds from the 2005 Transaction to retire debt owed General Electric Capital

Corporation, to pay Parthenon Capital $2 million, and to satisfy transaction costs.

Accordingly, as Lowey observed in his expert report, the Debtor's post-closing balance

sheet was not significantly improved as a result of the 2005 Transaction.  Indeed, Brown

recognized the Debtor's precarious position in emails sent to Kulkarni, a situation which

ultimately led to the Sales Leaseback Transaction.

    The Court concludes an identity of interest between Tencara and the Debtor existed.

Neither party wanted the business to fail and both Kulkarni and Callan expressed some

optimism about achieving profitability through the reduction in manufacturing costs

though outsourcing to India.  Indeed, Kulkarni guaranteed the Debtor's obligations to

CapSource.  While the Debtor lacked the financial ability to effectuate that plan, Callan,

through Tencara, was supportive of Kulkarni's vision and relied upon Kulkarni to

implement cost savings.  Callan did not exercise oversight of the Debtor's operations until

shortly before the Sales Leaseback Transaction when the Debtor's relationship with

CapSource had soured.

    At the time Tencara advanced funds to the Debtor, the Debtor was able to obtain

---

[27] Payments made to Kulkarni at the closing of the 2005 Transaction totaled
$382,980, and the Debtor, at Kulkarni's direction, diverted funds to the UK operations in
the sum of $180,000.

Case 07-01179   Doc 204   Filed 01/21/11   Entered 01/21/11 15:29:25   Desc Main
Document    Page 69 of 80

financing from CapSource, and Tencara negotiated directly with CapSource with respect to the subordination of its loan.  WPS, Inc. had considered, but did not pursue, an offer from Aeroglide.  Additionally, Kulkarni had investigated other financing sources. Although the Debtor's ability to obtain funding from other sources was circumscribed, it was nonetheless able to obtain financing from two outside sources: CapSource and Tencara, and later was able to effectuate the Sales Leaseback Transaction with NL Ventures.  Tencara's advance was subordinated to CapSource's Revolving Credit, Term Loan and Security Agreement, and it was not used to acquire capital assets.  Indeed, the proceeds from the 2005 Transaction were used to payoff General Electric Capital Corporation and to pay Parthenon Capital $2 million, as well as to satisfy transaction costs, including substantial legal fees.

There was no sinking fund to provide for repayment of either CapSource or Tencara.

Having reviewed the factors set forth by Third, Fourth and Sixth Circuits Courts of Appeal, the Court shall address the <u>Hyperion</u> factors that differ from the eleven factor test originally set forth in the <u>Roth Steel</u> case.  These include the ratio of shareholder loans to capital, the degree of  shareholder control, and how the debt was treated in the Debtor's business records.  *See* <u>In re Hyperion Enters., Inc.</u>, 158 B.R. at 561.  In this regard, Kulkarni and Parthenon Capital held equity interests, and Tencara was issued warrants.  Kulkarni, the Managing Member, held 100% of the common units of the Debtor, while Parthenon Capital held 100% of the preferred units. Kulkarni did not make any loans to the Debtor, although he personally guaranteed the CapSource facilities.  Additionally, he caused the

Debtor to pay him and Remedial sums in excess of $300,000. As the Managing Member, Kulkarni was in control of the Debtor. Tencara, as the holder of warrants, acceded to the release of its liens to facilitate the Sales Leaseback Transaction, and, in March of 2006, advanced $295,000 to the Debtor so it could pay its employees and CapSource. At that time, Callan testified that he expressed his views as to key employees and the desirability of quick auction sale in the bankruptcy court to preserve the going concern value of the company.

Finally, the Debtor appropriately treated Tencara's secured loan in its business records. There was no evidence that the Debtor considered the obligation other than what it was, namely a loan.

Weighing the factors discussed above, and focusing on discerning "the overarching inquiry," namely the intention of the parties, *see* In re SubMircron Sys. Corp., 432 F.3d at 456, the Court concludes that the $1.9 million advanced by Tencara to the Debtor was a loan. The only direct evidence of the parties' intent was the unequivocal testimony of Callan and Kulkarni that Tencara's $1.9 million advance was intended to be a loan. Moreover, the inferences from the financial circumstances confronting the Debtor do not warrant rejection of their testimony. Although some factors, such as undercapitalization, Tencara's subordination of its debt to that of CapSource, and the Debtor's use of the funds to satisfy existing debt rather than to acquire capital assets, as well as Tencara's payment of payroll and CapSource in the sum of $295,000, might suggest that the advance was equity, the majority of factors, most particularly the intent of the parties, weigh heavily in

70

favor of characterization of the advance as a loan.  As the United States Court of Appeals for the Third Circuit noted, however, '"when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company.'" Id. (quoting In re AutoStyle Plastics, 269 F.3d at 746-47).

Decisions considering the recharacterization issues highlight how the analysis of the proper characterization of an advance is fact driven.  This Court considered and compared the treatment afforded Tencara's secured claim with the treatment afforded Parthenon Capital's notes, which were secured by the assets of WPS, Inc.  A comparison of the facts surrounding the Debtor's obligation to Tencara and the treatment of its claim also stands in contrast to the circumstances present in the cases cited by the Court.  For example, in Dornier Aviation, the Fourth Circuit cited the insider status of GMBH, which wholly-owned the debtor as an indirect subsidiary, the lack of a fixed maturity date with respect to GMBH's purported loan, the fact that the debtor was not required to repay the "loan" until it achieved profitability, and the purported lender's assumption of the debtor's losses in support of recharacterization.

In SubMicron Sys. Corp., the Third Circuit rejected a recharacterization claim where there was a fixed maturity date and interest rate and the parties intended to create a debt. In the instant case, the parties intended to and, in fact, prepared instruments evidencing debt.  The Court concludes that the close business and personal relationship between

71

Callan and Kulkarni does not obviate the manifest intention of Tencara and the Debtor to

create a debt.

In Miller v. Dow (In re Lexington Oil and Gas Ltd., Co.), 423 B.R. 353 (Bankr. E.D.

Okla. 2010), the Court, in evaluating the intention of the parties, observed:

> [O]ne can ascertain the intent of the parties by looking at the
> circumstances surrounding the creation of the "debt." By their nature,
> lenders are prudent. I's are dotted, t's are crossed, and money is advanced
> by a lender only after everything appears to be in order. There is a simple
> reason for this. Lending is, by its nature, a contractual arrangement. If the
> contract is not in order, not properly executed or, heaven forbid, unsigned,
> the lender at the end of the day may be left with little if anything to enforce.
> . . .

Id. at 370.   In Lexington Oil, the court considered the sloppiness associated with the

purported loans, stating that it was struck by the lack of precision and attention to detail.

Id.  The purported lenders neither reviewed documents before money was advanced nor

consulted with counsel.  The court concluded that "[t]hese actions do not square with the

actions of a prudent lender or anyone who is actually loaning money."  Id.

In contrast to circumstances in Lexington Oil, Tencara, whose principal was a

sophisticated businessman, engaged counsel, ensuring that the t's were crossed and the i's

dotted.  Moreover, although Tencara obtained warrants, it did not purchase units at the

same time it advanced funds as was the case in Lexington Oil.  The Trustee complains that

Callan, through Tencara, and Kulkarni "sought the best of both worlds - an investment

with no risk," adding "[t]he result was to enable Kulkarni to obtain 'something for

nothing,' by obtaining the equity of the Debtor with no cash infusion."  While the Court

recognizes that Kulkarni shamelessly used his positions in Wolverine Proctor, LLC and the

Debtor to advance his personal financial interests, the Court does not find that Callan and

Kulkarni engineered the 2005 Transaction - - the leveraged buyout of WPS, Inc. - - with the

intention of benefitting Kulkarni personally.  Indeed, Parthenon Capital concluded that

"the most viable option for the business was to transact it back to Deepak Kulkarni."

In <u>Lexington Oil</u>, the court discredited the testimony of the defendants.  In the

instant case, the Court concludes that the 2005 Transaction was not designed for the

singular purpose of abetting Kulkarni's reacquisition of the business of WPS, Inc.  The 2005

Transaction also included an attempt to restructure and revitalize that business through

outsourcing manufacturing.  Moreover, Callan, on behalf of Tencara, negotiated with

CapSource, and Kulkarni guaranteed  the Debtor's obligation to CapSource.  Under these

circumstances, <u>Lexington Oil</u> is readily distinguishable.

The Debtor did not afford Tencara any of the rights provided to the defendant,

Stanley Black, in <u>AtlanticRancher</u>.  Those rights included the right to approve any proposal

to  incur  any  debt  and  to  approve  any  payments  over  $5,000.[28]    Indeed,  in

---

[28] The rights set forth in the parties' agreement in <u>AtlanticRancher</u> included the
following:

(i) Any proposal to incur, assume or guarantee any debt for borrowed
money . . .;

(ii) Any proposal to issue any capital stock of the Company(except as to
any "Options" as defined in the Warrant), or issue any securities
convertible into shares of capital stock of the Company, or, to issue any
options, warrants or other rights to purchase or participate in any such
stock or other securities of the Company or otherwise after the
capitalization of the Company;

73

_____

(iii) Any proposal to make any expenditure not previously identified in an approved budget, or the entering into any contract or commitment involving aggregate payments in excess of $5,000;

(iv) Any proposal for making any public announcement relating to or identifying the Subscriber [Emilia Black] or any of her affiliates, except if required by law;

(v) Any proposal for the merger of [sic] sale of the Company or the sale of all or substantially all its assets;

(vi) Any proposal to amend the charter or by-laws of the Company;

(vii) Any proposal for the redemption or purchase of any outstanding securities of the Company;

(viii) Declaration or payment of any dividends, whether in cash, stock or other property;

(ix) Payment of compensation to . . . [the debtor's principal] . . . in an aggregate amount in excess of $115,000;

(x) Use of proceeds of any insurance received by the Company after the Subscriber invests in the Company;

(xi) Any proposal involving employment or a commercial relationship with or any payment to any relative of an executive or a shareholder of the Company . . . or to an affiliate of any shareholder of the Company; . . .

(xiii) The appointment of committees of the board of directors or officers of the Company and any proposals relating to the compensation of officers or key agents or employees of the Company;

(xiv) Any proposal to permit the Company or its subsidiaries or affiliates to conduct any type of business other than currently authorized or provided for in the current business plan or offering memorandum of the Company;

(xv) Any changes in financial reporting or accounting principles of the

AtlanticRancher, AtlanticRancher's former counsel advised the board of directors against

consummating the transaction with the defendants because the terms and conditions posed

a significant risk of loss of control of the company as "'the structure and terms of the

financing, including the opinion requirement, will enable the Blacks to take control of the

company at a bargain price.'" 279 B.R. at 419.

In the present case, there was no evidence that Tencara (or Callan) was involved in

day-to-day decision making.  Tencara did not exert extensive or pervasive control over the

affairs of the Debtor.  Indeed, quite the opposite occurred.  The Trustee asserts that "Callan

did little in the face of the declining fortunes of the Debtor to safeguard his debt" and that

Tencara released its liens in conjunction with the Sales Leaseback Transaction, relying upon

his friendship with Kulkarni to assure that Tencara would be repaid.  The Court disagrees.

While Callan may not have been actively engaged in the business affairs of the Debtor,

Tencara retained a security interest in its furniture, fixtures and equipment and other assets

pursuant to the Security Agreement executed by the Debtor on February 11, 2005 after the

---

Company; it is agreed that the Company's financial statements will be
prepared in accordance with GAAP.

(xvi) Any change in the independent auditors of the Company;

(xvii) Approval of the Company's annual operating and capital budgets;

(xviii) Any proposal or action to cause or permit any subsidiary or affiliate
of the Company to take or be affected by the action of the nature described
in (i) through (xvii) above.

In re AtlanticRancher, Inc., 279 B.R. at 417-418.

sale of the real estate to NL Ventures.  Callan testified credibly as to his analysis on behalf
of Tencara as to his reasons for relinquishing Tencara's liens on the real estate.  Although
Kulkarni and Callan had, and continue to have, a business and personal relationship, that
relationship did not cause Tencara to blur the line between an equity interest and a debt
obligation.  The contrast between Callan's undocumented personal loan to Kulkarni for a
portion of CapSource's commitment fee and the Tencara's $1.9 million loan to the Debtor
underscores that point.

### 3. Equitable Subordination

As noted by the United States Court of Appeals for the Third Circuit in <u>Dornier</u>
<u>Aviation</u>, equitable subordination "differs markedly and serves different purposes from
recharacterization."  453 F.3d at 232.  The focus of the equitable subordination analysis is
"'the behavior of the parties involved.'" <u>Id.</u> (quoting <u>Sender v.  The Bronze Group, Ltd. (In</u>
<u>re Hedged-Invs. Assocs., Inc.),</u> 380 F.3d 1292, 1297 (10th Cir. 2004)).  Thus, this Court must
determine whether Tencara engaged in some type of inequitable conduct, which resulted
in injury to creditors or an unfair advantage to it, and whether equitably subordinating its
claim would be consistent with the provisions of the Bankruptcy Code.  *See*
<u>AtlanticRancher</u>, 279 B.R. at 439 (citing <u>In re Fabricators, Inc.,</u> 926 F.2d 1458, 1464-65 (5th
Cir. 1991)).

The Court finds that the Trustee failed to establish by a preponderance of the
evidence that Tencara engaged in inequitable conduct that resulted in injury to creditors.
While the 2005 Transaction was no panacea, the business of WPS, Inc. and the Debtor was

cyclical, and the 2005 Transaction may have benefitted the business had CapSource proved

to be a more satisfactory lender and had an EX-IM facility in place immediately following

the February 11, 2005 closing.  Even with the elimination of $10 million in secured debt by

Citizens and the infusion of $14 million by Parthenon Capital, however, the business

ultimately failed.  It would appear to the Court that a combination of factors led to the

demise of the Debtor.    Obviously the unfavorable margins associated with the

manufacturing of the ovens, and the lack of EX-IM financing contributed to the Debtor's

difficulties.  Kulkarni's decisions to pay himself and Remedial for compensation allegedly

due them and to transfer funds of $180,000 to the UK operations, decisions which led the

Trustee to commence an adversary proceeding against him for, among other things, breach

of fiduciary duty, affected the Debtor's cash flow. Tencara, however, was not consulted nor

privy to those decisions.  Indeed, prior to the commencement of the case, its conduct in

releasing its liens to permit the Sales Leaseback Transaction assisted the Debtor and

permitted it to pay a substantial portion of its unsecured debt in the approximate amount

of $700,000, as well as to make a payment of $142,000 toward its pension obligations.

Additionally, Tencara advanced $295,000 to the Debtor in March of 2006.  While this

payment could be construed as a maneuver to protect equity, the Court credits Callan's

testimony that it was to preserve the going concern value of his collateral to a potential

buyer when the commencement of a Chapter 7 case was inevitable.

Although Tencara's "low ball" offer for the Debtor's assets at the commencement

of the case in the form of a credit bid in the amount of its secured claim plus additional

77

consideration could be considered inequitable, the Court did not approve the sale. Tencara provided postpetition financing to the Trustee and the Trustee eventually sold the Debtor's assets to CPM Holdings for $8,200,000, plus additional consideration of $500,000 in connection with a settlement of a license dispute.

The ultimate sales price for the Debtor's assets evidences Tencara's reliance on those assets as a source of repayment for its secured claim, as opposed to the Debtor's cash flow, which was used to make required interest payments. Additionally, because the Debtor's assets were not sold to Tencara, the Debtor's creditors were not harmed by its decision to do no more than protect its own position. Although the potential existed for the assets of the Debtor's predecessor to have been sold for $18.5 million to Aeroglide in a bankruptcy proceeding to have been commenced in late 2004, the failure to pursue that transaction lies with Parthenon Capital, not Tencara, as Parthenon Capital was indirectly in control of WPS, Inc. at the time. Indeed, Kulkarni, through counsel, thwarted the proposed sale, recognizing that repayment of Parthenon Capital would be prejudicial to unsecured creditors.

With respect to equitable subordination, misconduct is a prerequisite and determined on a case-by-case basis, *see* In re Merrimac Paper Co., Inc., 420 F.3d at 65, and conduct that shocks the conscience of the court is required. *See* In re Columbus Ave. Realty Trust, 968 F.2d at 1361 (citations omitted). In other words, the Court would have to find that the personal relationship between Callan and Kulkarni overrode the evidence that the loan between Tencara and the Debtor was part of an arms-length transaction. The Trustee,

78

however, did not establish that Tencara was a fiduciary of the Debtor and misused its position to the disadvantage of other creditors; that Tencara dominated or controlled the Debtor to the disadvantage of others; or that Tencara defrauded creditors.  *See* In re 604 Columbus Ave. Realty Trust, 968 F.2d at 1359-60.

Both Callan and Kulkarni testified about their business and personal relationship. This Court would have to find their testimony to be incredible and infer that Callan permitted Tencara to be used as a straw of Kulkarni for his personal benefit; to infer that the Tencara loan was an investment in the Debtor, and that the interest payments made to Tencara were a return on its investment.  Those inferences are neither compelling nor warranted.

## IV. CONCLUSION

In view of the foregoing and having utilized and weighed the multiple pertinent factors facilitating determination of the proper characterization of Tencara's $1.9 million advance to the Debtor, as well as the standards applicable to 11 U.S.C. § 510(c), the Court shall enter judgment in favor of the Defendant and against the Plaintiff on all counts of the Second Amended Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: January 21, 2011
cc: Lynne Riley, Esq., Janet E. Bostwick, Esq., Lee Harrington, Esq.

79